THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH RUSKEY, Defendant-Appellant.

First District (5th Division)   No. 84—1678

Opinion filed July 18, 1986.

James J. Doherty, Public Defender, of Chicago (Marilyn Martin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Inge Fryklund, and Graham C. Grady, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

After a trial by the court on a one-count indictment which charged armed robbery, Joseph Ruskey and Robert Piehl were found guilty of robbery and were sentenced to three and four years' imprisonment, respectively. Piehl does not appeal. Ruskey contends on this appeal that the trial court did not comply with the sentencing statute and abused its discretion when it denied his application for probation. The sequence of events in the trial court follows.

The indictment alleged that Robert Piehl and Joseph Ruskey on November 22, 1981, in Cook County, committed the offense of armed robbery, in that they by the use of force and by threatening the imminent use of force while armed with a dangerous weapon took United States currency from the person of Deborah Cregier, in violation of section 18–2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 18–2).

It appears from the record that pursuant to Illinois Supreme Court Rule 402(d), Plea Discussions and Agreements (103 Ill. 2d R. 402(d)), the attorneys and the trial court held a conference discussion on the possibility of the State proceeding against the defendants on a reduced charge of robbery. (Ill. Rev. Stat. 1979, ch. 38, par. 18–1.) The conference produced no accord. When the indictment came on for trial on April 24, 1984, the trial court informed the defendants:

> "You're charged with armed robbery, for which you could receive a minimum of six and a maximum of thirty years in the penitentiary, or on the other hand, you could be found guilty of a lesser included offense. Do you understand?"

Both defendants responded in the affirmative. The trial court then advised the defendants of their right to trial by jury, which each defendant stated he understood and waived. Each defendant signed a written jury waiver.

The trial was postponed to the following day because of the court's engagement in another trial, which prompted the assistant State's Attorney to advise the defendant Piehl that he could be tried *in absentia* should he fail to appear. Thereupon, the following colloquy occurred:

"THE COURT: I think he has been advised of that in the part of the right to proceed without him. And I should further state for the record that this discussion today and the execution of the jury waivers were after we had a conference, but no definite commitments were made by the court as to what would happen in a bench trial. You both understand that?

Defendant Piehl A. Yes.

Defendant Ruskey A. Yes."

The trial began April 25, 1985, and produced the following evidence.

### THE STATE'S EVIDENCE

DEBORAH CREGIER testified, direct-examination:

She was 27 years old, a school teacher and a part-time cashier at the 7-Eleven store at 3800 North Central in Chicago. She worked the 4 p.m. to midnight shift the night of November 22, 1981, along with Dan, a co-worker. At approximately 9 p.m. she was at the cash register behind the counter, near the door. There were four customers in the store. Cregier identified the defendant Ruskey in court as one of the men who was present in the store at that time. Cregier had seen Ruskey prior to the night of the robbery, but did not know him.

Robert Piehl entered the store and went to the candy aisle and then to the wine department. Cregier thought she would have trouble with Piehl because she would have to ask him for identification for his purchase of wine. Piehl left the wine department and moved to the cash-register area, but did not get in line. At that time, defendant Ruskey moved from the candy aisle to the cash register and Piehl nodded to him to move ahead in the line. Ruskey moved ahead of Piehl in the line and paid for the items he was purchasing. Ruskey remained at the cash register. Piehl moved to the cash register and told Cregier to give him (Piehl) all the money in the register. Piehl had a black gun in his right hand under his coat. The barrel was visible. Cregier began taking money out of the register. Ruskey gave the money in his hand to Piehl. Cregier then gave the money, about $87,

from the register to Piehl. Piehl asked Cregier for the money underneath the register drawer. Cregier lifted the drawer and showed Piehl that there was no money there. Piehl then left the store, turned left and proceeded north along Central Avenue toward a gangway next to the 7-Eleven store.

Cregier went to tell Dan, her co-worker, that the store had been robbed. Ruskey told Cregier that he was going home and that she knew where he lived if she needed him. Cregier in fact did not know where Ruskey lived. Ruskey then left the store.

Dan called the police and Cregier gave the police a description of Piehl over the phone. She described Piehl as a white male, in his early 20's, with brown hair and a mustache, about 5 feet 7 inches, wearing a blue jacket and blue ski cap.

The police arrived shortly thereafter and Cregier recounted the robbery events to them. About 10 minutes later, Piehl was brought into the store by the police and Cregier identified him as the robber. Piehl was not wearing the coat and cap that he wore during the robbery. Ruskey returned to the store approximately 12 or 13 minutes after the robbery.

DEBORAH CREGIER testified, cross-examination:

Ruskey had money in his hand and was about to pay her when Piehl took Ruskey's money. Ruskey did not take any money from her. Piehl never pointed the gun at her but kept the gun in his coat.

When the police brought Piehl into the store, Cregier was afraid to identify him and initially said that she was not sure if Piehl was the man. Shortly thereafter, however, she identified Piehl as the robber before the police departed with him. Cregier testified that she had no doubt that Piehl, whom she identified to the police and in court, was the man who held the gun and robbed her. The police brought the gun into the store on the night of the robbery and she identified it. Piehl was not present at that time.

LAWRENCE RYAN, a Chicago police officer, testified, direct examination:

He and his partner, Robert Whiteman, were patrolling in a squad car at about 9:15 p.m. on the night of the robbery. He heard a radio broadcast that an armed robbery had just occurred at the 7-Eleven store at 3800 North Central. A description was given by the dispatcher—a male white, brown hair, mustache, wearing a navy blue ski jacket.

Ryan and Whiteman proceeded to the address, drove through the parking lot and began a search of the area for the offender. While driving through an alley, Ryan spotted a figure crouched in a gang-

way. Ryan observed that he had dark hair and was wearing a blue ski jacket. Ryan stopped the car. The person ran north through the gangway away from the officers. Ryan and his partner exited the car and went through the gangway. They saw the man ringing the backdoor bell and pounding on the backdoor at 5621 Grace, which the officers later learned was Ruskey's residence.

The officers took the man (defendant Piehl) into custody. The people in the house said they did not know the man. The arrest occurred approximately two minutes after the officers began combing the area. Ryan found a navy blue ski cap, a jacket and a fully loaded .45-caliber automatic revolver at the scene of Piehl's arrest.

Within three or four minutes after he arrested Piehl, Ryan took Piehl to the 7-Eleven store and Cregier identified Piehl as the robber.

OFFICER JEROME BOGUCKI testified, direct examination:

He and his partner, Detective Kaupert, interviewed defendant Ruskey at approximately 10:30 p.m. on the night of the robbery. Ruskey told Bogucki and Kaupert that he was waiting in line in the 7-Eleven store to make a purchase and a man came in with a gun and took $3 from him. Ruskey was asked to identify Piehl. Ruskey told the officers that Piehl was not the robber. Officer Bogucki then discovered that Ruskey lived at the address at which Piehl was arrested.

Piehl was then questioned. He told the officers that he ran because he was carrying a gun he had just purchased when he heard and saw police cars. The officers then asked Ruskey why Piehl was knocking on his door. Ruskey responded that he was a friend of Piehl's mother, but he did not know Piehl's first name. Ruskey denied participation in the robbery.

At this point, Ruskey was given *Miranda* warnings and upon further questioning Ruskey admitted that he and Piehl had been driving around in his car and that he knew that Piehl had a gun. Ruskey admitted that he and Piehl went into the 7-Eleven together but that he was surprised when Piehl showed the gun and robbed the store. Upon Officer Bogucki's further questioning of Piehl, Piehl admitted that he and Ruskey rode in Ruskey's car looking for a place to rob and that they looked at several gas stations before deciding to rob the 7-Eleven store. Piehl recounted that they went in, that he took the money and that they were to later meet back at Ruskey's residence.

Bogucki recovered the receipt for the purchase of the gun from Piehl. Ruskey signed a consent-to-search form. The officers recovered a brown holster from the front seat of Ruskey's car where Piehl told them he left it.

JOHN WILSON, an assistant State's Attorney, testified:

He spoke with Piehl and Ruskey the morning following the robbery. Piehl told him that Ruskey visited his house and that he showed Ruskey the gun he had just bought. Ruskey suggested the possibility of robbing the 7-Eleven store and stated that the people there were "kind of dumb." Piehl stated that they drove to the store and he (Piehl) went in. Thereafter Ruskey entered the store. Piehl said that he robbed the store, went to Ruskey's house, which was two or three doors from the store, split the money and left. As Piehl was leaving Ruskey's house he saw squad cars and attempted to reenter the house. Ruskey would not let him in.

Ruskey confessed to Wilson that he and Piehl had originally planned to rob a gas station but did not go through with it. Ruskey said that when they went to the 7-Eleven store, he thought about backing out, but that Piehl had the gun and robbed the store.

The State rested. The defendant, Robert Piehl, presented no evidence and rested.

On behalf of the defendant, Joseph Ruskey, it was stipulated that in July 1983 Ruskey had cancer surgery and radiation therapy which was to be followed by various malignancy tests over a five-year period. Ruskey then rested.

After closing arguments by the attorneys, the trial court stated:

"I have read my notes, gentlemen, and I have to after reviewing them, find both defendants guilty of robbery, the lesser included offense of robbery."

Presentence reports were ordered by the trial court and sentencing was set for May 10, 1984.

At the May 10, 1984, sentencing hearing, the assistant State's Attorney vehemently argued in opposition to the defendant's probation application. Piehl and Ruskey's attorney argued just as vociferously for probation.

The trial court had before it Ruskey's presentence report, which revealed that Ruskey was married, had three children, was employed at the time of his arrest and had been employed in a variety of occupations since 1970. The report indicated further that Ruskey had been treated for a drug problem and alcoholism and had been placed on probation for two years in 1972 for possession of marijuana.

A supplemental presentence report showed that Ruskey had cancer surgery in July 1983 and was undergoing post-operative radiation treatment. A letter was submitted from Dr. John H. Mahler, which stated that the defendant's prognosis was "guarded" for at least two years. Dr. Mahler recommended a physical examination of Ruskey every three months.

A letter from Ruskey's minister was introduced. The letter urged that Ruskey be granted probation inasmuch as Ruskey's only other criminal offense was committed over 10 years previously. The letter also noted that Ruskey volunteered for treatment for his alcohol and drug problem after he was released on bond and that he had not had any alcohol or drugs since leaving the hospital. The letter further stated that Ruskey's cancer required constant monitoring.

Ruskey expressed regret to the judge for the offense and stated that he had rejoined his family and was employed. He asked that the court grant probation.

The trial judge denied Ruskey's application for probation and in imposing sentence stated:

"The court took into consideration at the time of finding the defendants guilty of robbery, rather than armed robbery, only because in the court's mind, opinion, the court felt that it had not been proved beyond a reasonable doubt that Miss Cregier actually saw a gun. Based on that I found you guilty of the lesser included offense.

The evidence was clear that Mr. Piehl bought the gun, from your own statements \*\*\*. Now, the question is as to what that term will be. Mr. Ruskey, I believe that God has taken care of part of the sentence that should be imposed on you. For that reason there is going to be a difference. Mr. Piehl, you went out and bought a gun \*\*\*. The court will sentence you for four years in the Illinois Department of Corrections. Mr. Ruskey, the court hereby sentence[s] you to three years in the Illinois Department of Corrections \*\*\*."

Thereafter, Ruskey filed a "Motion for a New Trial Or Reduction of Sentence." The motion alleged that when the cause came on for trial on April 24, 1984, Ruskey's attorney indicated to the court that Ruskey desired to be tried by a jury, and that a jury venire was brought to the courtroom, at which time the assistant State's Attorney inquired of Ruskey's attorney if he "would consider having a pretrial conference with the court to ascertain what the court would do if the defendant waived the jury and submitted the case for trial before the court." The motion alleged further that a conference was held with the court outside the presence of the defendant and without the defendant being advised that such a conference was being held. Ruskey's motion further alleged that in this conference the trial judge was "informed that the State had previously offered to reduce the charge from armed robbery in exchange for a plea of guilty to the charge of robbery, and that it [the State] would agree to a sentence of

probation with 30 days work release." The motion additionally recited that the trial court was informed in this conference that Ruskey had refused to plead guilty to the reduced and lesser charge of robbery and probation sentence with 30 days work release, and that because of the State's Attorney's office policy, the offer had been irrevocably retracted and cancelled. Ruskey's motion also asserted that the trial court informed Ruskey's attorney that if Ruskey waived a trial by jury, the trial court would find the defendant guilty of robbery and "based on the pretrial conference" would sentence the defendant "in accordance with the State's prior offer."

Ruskey's motion further asserted that subsequent to this conference, Ruskey's attorney informed him that if he waived a trial by jury the trial court would find him guilty of robbery and place him on probation, with the first 30 days thereof to be served in work release. "Although insisting he was innocent of the charge in this case," Ruskey's motion contended, Ruskey agreed to waive trial by jury "and accept the probation knowing if the jury found him guilty of armed robbery the court would likely sentence him to in excess of 10 years in the penitentiary." The motion stated that Ruskey thereafter executed a jury waiver, that the trial of the cause commenced on April 25, and that he "presented no evidence to rebut the State's case in light of the pretrial conference with the court, even though the defendant had insisted that he took no part in the robbery, and would have so testified if he believed the case was being contested." Ruskey's motion prayed that the court grant a new trial "or reduce his sentence in accordance with the pretrial conference."

Ruskey's motion for a new trial or for reduction of sentence came on to be heard on July 2, 1984, at which time Ruskey testified in his own behalf on direct-examination as follows:

"Q. Now, prior to April 24th, the last time it was set for trial, do you recall at anytime prior to that any offers being made to you to plead guilty to the charge of robbery?

A. Yes, I do.

\* \* \*

Q. And do you recall what the offer that was made some time before April 24th was?

A. Work Release and probation.

Q. To the charge of robbery?

A. Yes.

Q. And at that point, you turned that down, did you not?

A. Yes, I did.

Q. Now, on April 24th when it got to court, the case was

set for trial, was it not?

A. Yes, it was.

Q. Were jurors called into the courtroom?

A. Yes, they were.

\* \* \*

Q. When the jurors were brought into the courtroom, do you recall at any time my going into Judge Mahon's chambers while you were sitting there?

A. Yes, I do.

\* \* \*

Q. Some time after that, did I come out of Judge Mahon's chambers?

A. Yes, you did.

Q. And what happened when I came out of his chambers?

A. Well, you came up to me and you told me, 'Let's go out in the hall, I want to talk to you.' At that point, you said that the Judge made an offer of probation if I waived the jury, that I would be put on probation—found guilty of the charge.[1]

\* \* \*

Q. And I indicated to you that if you waived the jury, the Judge would find you guilty of robbery and give you the same probation and Work Release that was offered to you previously?

A. Yes.

Q. And at that point, what did you tell me?

A. I told you I wasn't guilty of the charge and I would like to go with a jury.

\* \* \*

Q. What did I say to you at that point?

A. You said if the jury would find me guilty that I could get as much as ten to twelve years in prison. And I was afraid.

Q. Did you say anything to me at that point?

A. Yes. I said that I would waive the jury.

\* \* \*

Q. And after that conversation, subsequently, or after that, were you called up before Judge Mahon and did you waive a jury?

A. Yes, I did.

---

[1]The trial judge stated, following argument on Ruskey's motion for a new trial or for reduction of sentence, that he did not tell Ruskey's attorney that he would place Ruskey on probation. Ruskey's attorney did not dispute or in any way contradict this statement.

Q. And when you waived the jury, what was your understanding of what would happen with the case?

A. That I would be found guilty of robbery, have Work Release and Probation."

Ruskey testified on cross-examination:

"Q. Now, as a matter of fact, before we even went to a trial, and after you had acknowledged that you gave up your right to a jury, you were advised by this court *** that there had been a conference in chambers with your lawyer present and the lawyer for your co-defendant. And you were advised of that, weren't you?

A. I don't remember.

* * *

Q. Well, sir, you were in this courtroom on the 24th of April, 1984, that is when you signed a jury waiver, weren't you?

A. Yes.

Q. And at that time do you remember that his Honor, Judge Mahon said to you at that time—and I will quote on Page 6 from the transcript—'And I should further state, for the record, that this discussion today, and the discussion of the jury waivers was after we had a conference, but no definite commitments were made by the Court as to what would happen in a bench trial. You both understand that?' And do you remember saying, 'Yes,' to that question?

A. No, I don't."

After hearing arguments of the attorneys in support of and in opposition to Ruskey's motion for a new trial or for reduction of sentence, the trial judge stated:

"I am going to make a statement so that you can respond if you want to. *** Prior to coming out into this courtroom and getting these jury waivers from both defendants, the Court had a conference with the attorneys concerned, and at the time had indicated its willingness to listen, if they were going to agree to—consider a plea of guilty. We had a jury in this room, because the defendants demanded a jury. The jury was sitting in here. Then we came back and they advised me that they would not plead guilty, and they would prefer to have a bench trial. At that time I explicitly and repeatedly told them there have been no promises, all I can tell you gentlemen, is that I will be fair. And this record *** bears out the fairness that I gave these two defendants. They should well be found

guilty of armed robbery. But I elected to say, well, subjectively maybe this girl did not see the gun. That's the only basis that they were found guilty of robbery rather than armed robbery.

\* \* \*

This Court never did agree to any sentence, to impose any probation on either defendant, and told these attorneys \*\*\* at the time that the jurors were sitting out here that all the Court could do was give these men a fair trial with no promises and no commitments \*\*\*."

The court denied Ruskey's motion for a new trial and sentence reduction.

Ruskey argues for reversal that the trial court failed to comply with the sentencing statute and abused its discretion when he denied his probation application.

Ruskey was charged with armed robbery in violation of section 18—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 18—2). This statute provides: "A person commits armed robbery when he or she [takes property from the person or presence of another, by the use of force, or by threatening the imminent use of force] while he or she carries on or about his or her person, or is otherwise armed with a dangerous weapon." Armed robbery is a Class X felony (Ill. Rev. Stat. 1979, ch. 38, par. 18—2(b)) and is a nonprobational offense. It is provided in section 5—5—3(c)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3(c)(2)): A period of probation, a term of periodic imprisonment or conditional discharge shall not be imposed for \*\*\* [a] Class X felony. Except for the extended term provision for a Class X felony provided in section 5—8—2(a)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)(2)), which is inapplicable here, the penalty for a Class X felony is mandatory imprisonment for not less than 6 years and not more than 30 years. Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(3).

There was an abundance of uncontradicted evidence presented at the trial of the cause on which the trial court might have found Ruskey guilty of the armed-robbery offense with which he was charged. The unrefuted testimony of the victim Deborah Cregier, the arresting officers' testimony of their recovery of the gun, the gun's holster, Piehl's receipt for the purchase of the gun, and Ruskey's undisputed confession provided the trial court with adequate evidence that defendants, Ruskey and Piehl, planned to commit an armed robbery of the 7-Eleven store and that pursuant to their plans they entered the 7-Eleven store and carried out the armed robbery.

The trial court could have concluded and there was ample evidence to establish that Ruskey and Piehl entered the 7-Eleven store and that while Ruskey acted as a decoy, Piehl, while armed with a gun in his right hand under his coat with the barrel visible, with force and by threatening the imminent use of force, took money from the person of Deborah Cregier. Although there was no evidence that Ruskey was armed, or that he overtly participated in Piehl's taking of the money from Cregier, nevertheless Ruskey was guilty of the offense according to the accountability statute (Ill. Rev. Stat. 1979, ch. 38, par. 5—2(c)). This statute provides: "A person is legally accountable for the conduct of another when *** [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

The trial court, however, did not find Ruskey guilty of the nonprobationable, mandatory-imprisonment, armed-robbery offense. Rather, it appears that the trial court extended Ruskey a merciful element of grace and found him guilty of robbery, "the lesser included offense." (Ill. Rev. Stat. 1979, ch. 38, par. 18—1(a).) This statute provides that a person commits robbery when he takes property from the person or presence of another by the use of force by threatening the imminent use of force. This statute further provides that robbery is a Class 2 felony and under the provisions of sections 5—5—3(a) and 5—5—3(b)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—5—3(a), (b)(1)), robbery is a probationable offense.

When the trial court denied Ruskey's application for probation (and immediately before it sentenced Ruskey to three years' imprisonment), the trial court explained that it found Ruskey (and Piehl) guilty of the lesser included offense of robbery, rather than armed robbery "only because in the court's mind, opinion, the court felt that it had not been proved beyond a reasonable doubt that Miss Cregier actually saw a gun." The trial court then stated: "The evidence was clear that Mr. Piehl bought the gun, from your own statements ***. *** Mr. Piehl, you went out and bought a gun ***."

Ruskey filed his motion for a new trial or in the alternative for a reduction of sentence. The trial court heard evidence and argument thereon. In denying the motion the trial court again referred to its efforts to be fair in Ruskey's trial and sentencing. In denying Ruskey's new trial or sentence reduction motion, the trial court observed: "[T]his record *** bears out the fairness that I gave these

two defendants. They should well be found guilty of armed robbery. But I elected to say, well, subjectively maybe this girl [Deborah Cregier] did not see the gun. That's the only basis that they were found guilty of robbery rather than armed robbery."

■■ Ruskey contends that the trial court should have further exercised its discretion by granting him probation and he argues that the trial court abused its discretion in not so doing. We do not agree.

Ruskey relies on section 5—6—1(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—6—1(a)), as supportive authority for his argument. This statute provides:

"Except where specifically prohibited by other provisions of this Code, the court shall impose a sentence of probation or conditional discharge upon an offender unless, having regard to the nature and circumstances of the offense, and to the history, character and condition of the offender, the court is of the opinion that:

(1) his imprisonment or periodic imprisonment is necessary for the protection of the public; or

(2) probation or conditional discharge would depreciate the seriousness of the offender's conduct and would be inconsistent with the ends of justice."

■■ This statute does not confer an absolute right to probation. The granting or denial of probation rests within the sound discretion of the trial court, and refusal to grant probation will be disturbed by a reviewing court only upon a showing of an abuse of the trial court's discretion. (*People v. Sprouse* (1981), 94 Ill. App. 3d 665, 667-68, 418 N.E.2d 1070.) In *People v. Hicks* (1984), 101 Ill. 2d 366, 375, 462 N.E.2d 473, the supreme court stated:

"We have repeatedly emphasized the undesirability of a reviewing court simply substituting its judgment or preference as to punishment for that of the sentencing court. The trial judge is ordinarily best situated to tailor a sentence or other disposition to the needs of the case. He balances the appropriate factors in imposing sentence, and the exercise of this discretion should not be altered upon review absent an abuse of that discretion. [Citations.]"

■■ Because the trial court is the better forum for establishing and imposing an appropriate sentence, a court of review gives deference to the trial court's determination. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344.) The trial and sentencing proceedings afford the trial court a superior opportunity to consider

the various factors upon which a sentence is predicated than that which is available to a reviewing court by the "cold record." *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 156, 368 N.E.2d 882.

Ruskey argues that the foregoing statute requires that the record must indicate why the trial court was of the opinion that he should not have been granted probation and why granting him probation would deprecate the seriousness of the offense. Ruskey further contends that this statute also demands that the trial court affirmatively reflect in the record why it is of the opinion that imprisonment was necessary for the protection of the public. Ruskey relies on *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541. In *Cox*, the supreme court stated:

"Whenever a sentence of imprisonment or periodic imprisonment is imposed, the record must indicate that the judge is of the opinion that imprisonment is necessary for the protection of the public or that probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice. *Substantial compliance with section 5—6—1 may exist even if the judge does not specifically say that 'imprisonment is necessary for the protection of the public' or that 'probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice.'* If the record demonstrates substantial compliance with this requirement, then a reviewing court may alter the sentencing judge's disposition only upon a finding of an abuse of discretion." (Emphasis added.) 82 Ill. 2d 268, 281, 412 N.E.2d 541.

■ The statute does not require the trial court to set forth specific findings, or to verbalize the reasons, or to expressly state the basis upon which it relies for refusing to grant probation. (*People v. Roberts* (1983), 115 Ill. App. 3d 384, 388-89, 450 N.E.2d 451.) Although it would be preferable for the court to do so, failure to do so does not automatically void the sentence. *People v. Kuesis* (1980), 83 Ill. 2d 402, 409-10, 425 N.E.2d 323.

The record before us, however, clearly reflects why the trial court was of the opinion that imprisonment was necessary for the protection of the public and why probation would deprecate the seriousness of Ruskey's conduct and would be inconsistent with the ends of justice. Even though the trial court neglected to use the statutory "magic words," it, nevertheless, essentially complied with the statute's requirements.

■ The record reveals that the trial court meticulously consid-

ered Ruskey's application for probation. The trial court had before it and considered Ruskey's presentence and his supplementary presentence reports. In denying probation and in sentencing Ruskey to three years' imprisonment, the trial court was authorized to rely on the facts that the robbery was at night and of a young lady in a neighborhood establishment. The trial court pointed out that the robbery was planned and that the victims were chosen because they were "dumb." Ruskey was a subterfuge in the robbery and endeavored to decoy the officers from the true culprit. The trial court stated that it would be remiss in its duty if it did not impose an imprisonment sentence. The trial court considered Ruskey's health in determining the length of the sentence and stated, "God has taken care of part of the sentence that should be imposed on you." The question is not whether from our review of the trial record we would have imposed a different sentence. Rather, the questions to be resolved from our review of the record are whether the trial court complied with the sentencing statute and whether the trial court abused its discretion in denying Ruskey's application for probation. We conclude from our review of the record that the trial court complied with the sentencing statute and that the trial court did not abuse its discretion when it did not grant Ruskey probation and sentenced him to three years' imprisonment.

The defendant's reliance on *People v. Turner* (1982), 110 Ill. App. 3d 519, 442 N.E. 2d 637, is misplaced. In *Turner*, the reviewing court vacated the defendant's five-year imprisonment sentence for forgery because of noncompliance with the sentencing statute, in that the record was totally "silent" as to the judge's reasons for not granting probation and imposing the imprisonment sentence. The trial court's reasons are not absent but are clearly stated in the record before us.

■ Ruskey argues that the trial court abused its discretion in considering as aggravation in imposing sentence that a gun was used in the robbery because the evidence failed to establish beyond a reasonable doubt that Deborah Cregier saw the gun during the commission of the robbery. As previously pointed out, the trial court clarified its finding of guilt. In denying the motion for a new trial and for sentence reduction, the trial judge stated: "They should well be found guilty of armed robbery. But I elected to say well, subjectively maybe the girl did not see the gun. That's the only basis that they were found guilty of robbery than armed robbery."

Although the trial court stated it did not believe beyond a reasonable doubt that the victim actually saw the gun during the rob-

bery, the trial court was not thereby precluded from relying on other evidence of the use of the gun in the commission of the robbery in determining the sentence to impose. Significantly, the trial court did not find that a gun was not used in the robbery. The trial court merely concluded that the evidence did not establish beyond a reasonable doubt that the victim saw the gun.

Regardless of whether the victim saw the gun, there was other evidence that a gun was used in the commission of the robbery. Piehl purchased the gun, the receipt for which was recovered by the officers. Piehl and Ruskey confessed to using the gun during the robbery. The gun was found in the gangway next to Ruskey's house, close to where Piehl was arrested, and the holster for the gun was recovered from the front seat of Ruskey's car.

The following authorities upon which Ruskey relies to support his contention that the trial court improperly considered that a gun was used in the robbery in imposing sentence are inapplicable to his case. In *People v. Cross* (1984), 100 Ill. App. 3d 83, 426 N.E.2d 623, the trial court in sentencing relied on a statement that the battery victim had died, although the jury had found the defendant guilty of only a battery, rather than murder. In *People v. Maldonado* (1980), 80 Ill. App. 3d 1046, 400 N.E.2d 656, the trial court in imposing sentence was improperly influenced by hearsay evidence of the defendant's commission of other prior offenses. In *People v. Gant* (1974), 18 Ill. App. 3d 61, 309 N.E.2d 265, the trial court in imposing sentence relied on the robbery victim's death, which was not by allegation or proof attributable to the defendant. None of these authorities cited by the defendant prohibited the trial court in the case before us from relying on the trial evidence of the use of the gun in the commission of the robbery in determining the sentence to be imposed.

The judgment is affirmed.

Affirmed.

SULLIVAN, P.J., and LORENZ, J., concur.