THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES ROSE, Defendant-Appellant.

First District (3rd Division)   No. 1—87—2645

Opinion filed December 6, 1989.

1084

Randolph N. Stone, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Paula Carstensen, and Catherine A. Bernard, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, James Rose, was convicted of voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) and sentenced to 12½ years' imprisonment in the Illinois Department of Corrections. Defendant appeals, contending that the trial court (1) erred in denying his motions to quash his arrest and to suppress evidence, (2) abused its discretion by discharging one of the jurors, and (3) considered improper factors in sentencing him. We affirm.

At the hearing on the motions to quash the arrest and suppress evidence, Detective George Carey testified that on July 23, 1986, at about 3 a.m., he and his partner, Detective Al Grefsheim, were assigned to investigate a homicide at an apartment building located at 5641 South Michigan Avenue in Chicago. The victim, Earl Grigsby, had been stabbed. Prior to arriving at the scene, beat officers had in-

formed the detectives that there were two offenders involved and that one of them was Keith Allen. Carey obtained the address for Allen from the police arrest files. Upon arriving at that address, which was down the street from the crime scene, the detectives found it to be a vacant lot. The detectives then proceeded to 5641 South Michigan, where they interviewed witnesses concerning the homicide.

Carey interviewed Sharon Collins, who stated that the stabbing was the result of an altercation which had occurred on the weekend prior to July 23. On that weekend, there had been a fight in front of the building between a man named Tyrone Russell and a man known only as James. The victim attempted to break up the fight. After Russell knocked out James, the victim gave shelter to Russell in his apartment. Later, James came upstairs and knocked on the door of the victim's apartment in search of Russell. The victim told James that he did not know where Russell was, and James said that if he ever found Russell, he would kill him.

Carey further testified that Sharon told him that on the evening of the 23rd, she was with Janice Collins and Denise Dunmore in the victim's apartment. The victim had gone out to the store. When she heard the downstairs doorbell continuously ringing, she walked out onto the balcony of the apartment, and a woman across the street yelled to her that someone had just stabbed one of their (Collins') boyfriends. Sharon ran out of the apartment and opened the vestibule door. The victim was standing there with blood on him, stating that James had done it. She let the victim inside, and he walked upstairs to the apartment, where he subsequently collapsed on the bedroom floor. Sharon then went across the street, in search of the woman who had yelled to her. The woman told her that two men were fighting the victim, and she gave Sharon a description of one of the men. Based on the woman's description, Sharon recognized one of the men involved to be Keith Allen. Information gathered from Janice Collins and Denise Dunmore corroborated that of Sharon.

Carey also interviewed Edward Green, the janitor of the building across the street. According to Green he had witnessed the fight at the building on the preceding weekend. One of the men in the weekend fight was involved in the stabbing. Green advised the detectives to speak with Denise Johnson, because she had been closer to the crime scene than he was and she would be better able to tell them about the stabbing.

The detectives then proceeded to the home of Tyrone Russell, whose address they had obtained from Collins. Russell informed them that he had been involved in the fight with James over the weekend.

After the fight, Russell was in the victim's apartment when James came looking for him. Russell heard James say that if he ever found Russell, he would kill him. Russell stated that he did not know who James was, what his last name was, or where he lived, but that the detectives should know because they had recently arrested James' brother, Tyrone Sims, for murder.

Grefsheim had handled the Sims case, and he knew that Sims lived with his mother. The detectives proceeded to the Sims address, where they met with Sims' mother. When asked whether Tyrone had a brother named James, the mother responded that he did, that his last name was Rose, and that he lived in an apartment on the third floor of the building. By this time, it was about 5:15 a.m.

The detectives went to the third floor of the building, knocked on the door, and Portes Harris, who appeared to have been awakened by the knock, answered. The detectives identified themselves, told Harris that they were looking for James Rose, and asked Harris whether Rose lived there. Harris responded in the affirmative, said that he was Rose's uncle, then stood back and told the detectives to come inside. The officers followed Harris down a hallway to a bedroom, Harris opened the door, and defendant was found sleeping there. The detectives did not have a warrant.

The detectives awakened defendant and informed him that they believed that he had been involved in the stabbing of Earl Grigsby. Defendant denied any involvement. Carey told defendant to come with them, and the detectives returned, with defendant, to the crime scene. Upon their arrival, Sharon Collins, Janice Collins, and Denise Dunmore started yelling that defendant was the James who had been in the fight over the weekend. The detectives took defendant out of the car, to make certain that the ladies' identifications were correct. Defendant was then placed under arrest, handcuffed, placed in the car and given his *Miranda* warnings.

At about 6 a.m., defendant was transported to the police department and placed in an interview room. Defendant was again given *Miranda* warnings. Defendant admitted that he had stabbed the victim, described the knife that he had used, and told the detectives that he thought that the knife could be found in the apartment, under his mattress.

Carey, Grefsheim and a third police officer, Swistowicz, returned to defendant's apartment. Harris again answered the door. The detectives told Harris that they were looking for defendant's knife and that defendant had told them that the knife was under his mattress. When they asked if they could come in and get it, Harris said "yes." The

officers went into defendant's bedroom and looked under the mattress for the knife, however, it was not there. Carmella, defendant's girlfriend, was in the room at the time. She told the detectives that she did not know where the knife was, but that they could look around. Officer Swistowicz found the knife in the kitchen, on top of a radiator. Carmella identified the knife as being that of defendant.

The detectives returned to the police station, and at about 3 p.m., Carey, along with assistant State's Attorney Kevin Horan, interviewed defendant. Defendant was again given his *Miranda* warnings, and he subsequently gave a court-reported statement confessing to the stabbing.

Detective John Markham testified that at about 8 p.m., on that same evening, he conducted a lineup which was viewed by Denise Johnson and Edward Green, occurrence witnesses. There were five people in the lineup, including defendant. The witnesses identified defendant as the offender.

Portes Harris testified in rebuttal. He stated that he lived at 125 East 57th Street, with defendant, his (defendant's) mother and his siblings. According to Harris, on the morning of the 23rd, there were four or five officers at the door. When he answered the door the officers asked for James Rose. Harris did not know whether James was at home, and he told the detectives that he would go to his room to check. Before Harris could get to defendant's bedroom, the officers were coming in the door. The detectives did not say that they wanted to arrest defendant; they said that they wanted to talk to him. Harris stated that he did not give the officers permission to come inside.

Later, at about 4 or 5 p.m., two or three officers returned to the apartment. They knocked on the door, Harris again answered, and the officers told him that they wanted to search defendant's room for a knife. Harris stated that he did not give the officers permission to search the apartment, and he did not know whether they had found anything as a result of their search.

On cross-examination, Harris stated that he had been with defendant's mother for eight years. He stated that he did not tell the police that he was defendant's uncle, but rather that he was his stepfather. According to Harris, Tyrone Sims was defendant's cousin, not his brother. He also testified that the police were polite each time they had come to the apartment and that they did not have their guns drawn. Further, Harris stated that had the detectives asked for permission to enter the apartment, he would have granted it.

At the close of the evidence, the trial court asked to hear argument concerning consent or exigent circumstances to enter the apart-

ment to make a warrantless arrest. The court also heard argument concerning consent to enter the apartment to search for the knife. Based on the evidence and the arguments of the parties, the court stated that it found that there was probable cause to arrest and that there had been consent to enter the apartment to search for the knife. The court denied defendant's motions to quash his arrest and to suppress the evidence.

At trial, Sharon Collins testified that she had seen defendant earlier in the day on July 23. Defendant stated to her that he wanted to fight the victim "heads up." Her testimony concerning the later events essentially corroborated the testimony of Carey.

Denise Johnson and Edward Green both saw the stabbing from across the street. They each testified that when the victim arrived at the vestibule of his apartment building, defendant accompanied him inside. Allen remained outside. Defendant and the victim had a fight, and after a few minutes, defendant came out and walked away. Allen ran.

Defendant asserted a defense of self-defense, and he testified in his own behalf. He stated that he was not certain whether it had been Russell or the victim who had knocked him down in the weekend fight. However, he did recall that the victim had grabbed and pushed him prior to him getting hit. Defendant stated that in spite of the incident, he did not harbor a grudge against either Russell or the victim.

Early in the day, on July 23, defendant saw the victim point him out to some people and he overheard him to say that defendant was the "punk" whom Russell had knocked out. Defendant admitted that he was upset over the comment.

According to defendant, on the morning of the stabbing, he entered the vestibule with the victim. The two were talking, and an argument ensued over who had hit defendant in the earlier fight. The victim put down his bags and grabbed defendant's arm. Defendant hit the victim, and the victim hit him back. Defendant, in an effort to protect himself, took out his knife and started swinging it at the victim. After he had stabbed the victim, he left the apartment, went home, thought about it, and then returned to the area. When the police arrived at the scene, defendant again left and went home.

Defendant's first contention on appeal is that the trial court erred in denying his motions to quash the arrest and to suppress the evidence. Defendant maintains that the State failed to prove either that the police had probable cause to arrest him, or that the warrantless entry into his home was justified. We disagree.

■ ■ ■ We first address defendant's argument that there was not probable cause to arrest him. Probable cause exists when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution to believe that an offense has been committed and that the person arrested has committed the offense. (*People v. Creach* (1980), 79 Ill. 2d 96, 101, 402 N.E.2d 228, *cert. denied* (1980), 449 U.S. 1010, 66 L. Ed. 2d 467, 101 S. Ct. 564; *People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356.) The trial court's determination that there was probable cause to arrest may be grounded on evidence which would not be admissible at trial, and it need not be sufficient to establish guilt beyond a reasonable doubt. (*People v. Lee* (1986), 151 Ill. App. 3d 510, 518, 502 N.E.2d 399.) In evaluating the existence of probable cause, courts are required to consider "probabilities and are not disposed to be unduly technical." *People v. Clay* (1973), 55 Ill. 2d 501, 504-05, 304 N.E.2d 280.

The State maintains that the police had probable cause to arrest defendant because of certain facts known to them at the time of the warrantless arrest. Our review of the record reveals that when the police went to defendant's home they knew the following facts: that a man named James was involved in the weekend fight with Russell and the victim; one of the men in the fight was the same man involved in the stabbing of victim; Keith Allen was with James on the evening of the stabbing; prior to his death, the victim repeatedly stated that James had done it; according to Russell, James was the brother of Tyrone Sims, who had recently been imprisoned for murder; Grefsheim had been involved in the Sims case and knew the address of Sims; and, according to Sims' mother, Sims had a brother named James, whose last name was Rose, and he lived in the apartment on the third floor of the building.

■ ■ Defendant argues that the police were led to him by two particularly weak links. First, he argues that Russell's source of information about James' identity was unknown. We understand defendant's argument to raise an issue of the reliability of Russell's information. Defendant's argument must fail. Russell was an ordinary citizen, not a paid informant, and the police were justified in relying upon the information gained from him. (See *People v. Bean* (1981), 84 Ill. 2d 64, 68, 417 N.E.2d 608, *cert. denied* (1981), 454 U.S. 821, 70 L. Ed. 2d 93, 102 S. Ct. 106.) Second, defendant argues that the fact that he had a different last name, and lived in a different apartment than Sims, should have caused the detectives to hesitate and to consider whether the James identified by Russell was, in fact, Sims' brother,

James. We reject defendant's argument. We do not think it to be unusual that siblings have different last names. Therefore, we find that the detectives' belief that defendant and Sims were brothers was not unreasonable, especially in light of the fact that it was Sims' mother who identified him as such. Based on this evidence, we conclude that the trial court's finding of probable cause was not manifestly erroneous. *Clay*, 55 Ill. 2d at 505.

Having determined that the arrest was properly supported by probable cause, we next evaluate defendant's argument that the warrantless entry into defendant's apartment was not justified. Defendant argues that there was neither consent nor exigent circumstances to justify the entry. Thus, he urges, in light of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, his warrantless arrest and any evidence which flowed from it were inadmissible, as "fruits of the poisonous tree." The State, contrarily, argues that the entry was consensual and that even if it had not been, there were exigent circumstances which justified it. It is well settled in Illinois that the police cannot enter a person's apartment to effect a warrantless arrest based on probable cause alone. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 928, 455 N.E.2d 733, *cert. denied* (1984), 467 U.S. 1208, 81 L. Ed. 2d 351, 104 S. Ct. 2394.) There must either be factors of exigency which warrant prompt police action (*People v. Abney* (1980), 81 Ill. 2d 159, 168, 407 N.E.2d 543), or a showing of consent to enter (*Bean*, 84 Ill. 2d at 69).

Where a warrantless arrest is made, the standard for valid consent to enter a dwelling, which has been applied by the Supreme Court, is whether the consent was voluntarily given. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.) Voluntariness of consent is determined by the totality of the circumstances. (*People v. Turner* (1986), 143 Ill. App. 3d 417, 424, 493 N.E.2d 38; *People v. Salgado* (1980), 83 Ill. App. 3d 653, 404 N.E.2d 432.) The requisite consent need not be given by the defendant; it may be obtained from a third party. (*United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988; *Bean*, 84 Ill. 2d at 64.) The authority which justifies third-party consent rests on the mutual use of the property by persons generally having joint access or control for most purposes. *People v. Stacey* (1974), 58 Ill. 2d 83, 317 N.E.2d 24.

Defendant argues that the State failed to prove that consent to enter his home was given, and even if there was consent, there was no proof that it was given voluntarily. The State bears the burden of proving that consent was voluntarily given. (*People v. Williams*

(1985), 130 Ill. App. 3d 758, 474 N.E.2d 1330.) It must be proved by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied. (*Williams*, 130 Ill. App. 3d at 762.) It is within the province of the trial court to determine the credibility of witnesses and to resolve any conflicts in the evidence. *People v. Clark* (1982), 92 Ill. 2d 96, 99, 440 N.E.2d 869.

The issue of consent was examined in *People v. Dunagan* (1983), 118 Ill. App. 3d 474, 455 N.E.2d 542. In *Dunagan* the evidence showed that when the police officers knocked, someone, most likely the defendant, inquired who it was. (*Dunagan*, 118 Ill. App. 3d at 477.) The door was opened when the officers responded "[P]olice." (*Dunagan*, 118 Ill. App. 3d at 477.) In deciding that the entry was nonconsensual, the court found that there was no evidence that anyone had invited the officers inside, but rather that they had simply entered when the door was opened. (*Dunagan*, 118 Ill. App. 3d at 477.) The case at bar differs from *Dunagan*. Here, there was clear and unequivocal testimony that the detectives entered the apartment at Harris' invitation. The trial court found that detective's testimony to be more credible than Harris', and we cannot conclude otherwise.

■ Defendant urges, relying on *Williams* (130 Ill. App. 3d 758, 474 N.E.2d 1330), that the case should be remanded for a hearing on the question of the voluntariness of consent. We find *Williams* to be distinguishable and, thus, we see no reason which would justify a remand. In *Williams*, at the defendant's hearing on his motion to suppress, the police officer testified that he had presented the defendant's co-tenant with a consent to search form, which he signed in his presence. (130 Ill. App. 3d at 760.) The police officers went to the defendant's home, knocked, and defendant's sister opened the door. The officers introduced themselves, and the sister "allowed" them to come into the apartment. (*Williams*, 130 Ill. App. 3d at 760.) The trial court found that defendant's co-tenant had executed a consent to search form and that there was probable cause to arrest the defendant. On appeal, the defendant did not argue that consent was not given, but rather that the State failed to prove that it had been given voluntarily. (*Williams*, 130 Ill. App. 3d at 761.) The appellate court held that the officer's statement did not sufficiently establish a voluntary consent and that the trial court had not specifically addressed the issue of voluntariness. (*Williams*, 130 Ill. App. 3d at 762.) Therefore, the court remanded the case to the trial court for a hearing on the issue of voluntariness. (*Williams*, 130 Ill. App. 3d at 762.) In the case at bar, the trial court heard the testimony of Carey and, if believed, it was sufficient to establish the voluntariness of Harris' con-

sent. The court also heard testimony from Harris that the entry of the detectives was done in a peaceful manner. Furthermore, the record is void of any evidence that either defendant or Harris refused entry to the officers or that they were otherwise uncooperative. (See *Turner*, 143 Ill. App. 3d at 424; *People v. Rimmer* (1985), 132 Ill. App. 3d 107, 476 N.E.2d 1278.) Despite the fact that the trial court here did not expressly state that it found Harris' consent to have been voluntary, we believe that there was sufficient evidence presented that it could have so found.

■ Defendant, in his brief, states that it is not clear that Harris had the authority to consent to the officers' entry into the apartment, and much less to their entry into defendant's bedroom. In Illinois, in cases in which it is established that defendant resides with his parents or close relatives, and the parents or relatives consent to a search of defendant's bedroom, it is presumed that there is a common authority over the premises sufficient to authorize the consent to search. (*People v. Howard* (1984), 121 Ill. App. 3d 938, 946, 460 N.E.2d 432.) This presumption may be overcome by evidence indicating that defendant had exclusive possession over the bedroom. (*Howard*, 121 Ill. App. 3d at 947.) Since the fourth amendment protects persons as well as objects, it would seem that the standard for consent to search must be the same as the standard for consent to entry into the defendant's home by the police to arrest him. *People v. Montgomery* (1980), 84 Ill. App. 3d 695, 701-02, 405 N.E.2d 1275.

Defendant cites to *People v. Bochniak* (1981), 93 Ill. App. 3d 575, 417 N.E.2d 722, *cert. denied* (1982), 455 U.S. 938, 71 L. Ed. 2d 648, 102 S. Ct. 1427, a case concerning authority of a third person to consent to a search of a defendant's home. In *Bochniak*, the defendant rented a garage from his mother. (93 Ill. App. 3d at 576.) The garage was located on the mother's property, and she had a key to it; however, she never used the garage. (*Bochniak*, 93 Ill. App. 3d at 576.) The court there held that the defendant had exclusive authority over the garage, and the fact that the mother owned the garage and had a key to it did not mean that she had actual authority to consent to a search of the garage. *Bochniak*, 93 Ill. App. 3d at 576-77.

■ Unlike *Bochniak*, we believe that the evidence showed that Harris had mutual use of the apartment. Defendant, in presenting his case, offered testimony that at the time of defendant's arrest, Harris lived at 125 East 57th Street with defendant, his mother, and his siblings, and that he was defendant's stepfather. In its closing argument, the State asserted that Harris, as a co-occupant of the home could give valid consent. There was neither testimony nor argument in re-

buttal. We find nothing in the record to indicate that Harris was only a casual visitor with limited access to the premises or that defendant had exclusive control over either the apartment or his bedroom. In fact, Harris testified that he had gone to bed there on the evening preceding the arrest, and in the morning, when the police arrived, he was only partially dressed. (*Cf. People v. Brown* (1987), 162 Ill. App. 3d 528, 515 N.E.2d 1285, *cert. denied* (1988), 488 U.S. 841, 102 L. Ed. 2d 86, 109 S. Ct. 112 (police could assume that teenager exiting the residence in her bedclothes had the authority to permit them to enter).) We conclude that Harris had authority to consent to the detectives' entry into the apartment.

■ Defendant next argues that the entry cannot be justified by the existence of exigent circumstances, and further, that the State has waived this theory by not arguing it below. We disagree. Generally, the waiver rule is applicable to the State only when the prosecution is appealing the trial court's decision to grant a defendant's motion to suppress. (See, *e.g., People v. Holloway* (1981), 86 Ill. 2d 78, 426 N.E.2d 871; but see *People v. Chianakas* (1983), 114 Ill. App. 3d 496, 501-02, 448 N.E.2d 620.) In such cases, the State is precluded from arguing a new theory on appeal because it acquiesced in an inconsistent theory below. (*People v. McAdrian* (1972), 52 Ill. 2d 250, 254, 287 N.E.2d 688.) However, it would be unfair to hold that the State, as the prevailing party in a motion to suppress, has waived any reason it might have argued in support of the court's ruling. (*People v. Keller* (1982), 93 Ill. 2d 432, 437, 444 N.E.2d 118.) However, further resolution of this issue is not required since we have decided that the entry was consensual.

■ Defendant's second contention on appeal is that the trial court abused its discretion in discharging a juror who arrived late on the second day of trial. A review of the record reveals that at the close of trial on the first day, the court informed the jury to be present the following day at 11 a.m. and that they would be supplied a phone number for the court in the event of an emergency. On the second day of trial, after the case was called, the court stated, for the record, that it was past 11:30 a.m. and that one juror, in spite of instructions to be there by 11 a.m., had not yet arrived and trial was about to begin. At that point, the tardy juror arrived. The court, in rejecting the juror's excuse that he was delayed by traffic, stated that it had no tolerance for irresponsibility and disrespect. After a hearing concerning the juror's reason for being late, and over defendant's objection, the trial court discharged the juror and replaced him with an alternate. There is no indication in the record that the juror at-

tempted to contact the court to advise it that he would be delayed. Defendant argues that the discharge was an abuse of discretion and that reversal is required. We disagree. The discharge of a juror and the impaneling of an alternate is an act of discretion by the trial judge, and absent a clear showing of prejudice, reversal is not required. (*Snyder v. Poplett* (1981), 98 Ill. App. 3d 359, 365, 424 N.E.2d 396; *People v. Thomas* (1979), 71 Ill. App. 3d 838, 841, 390 N.E.2d 414.) As the State correctly argues, the defendant's right to a fair and impartial jury does not mean that he has a right to have a particular juror included on the panel. (*People v. Nicholson* (1978), 61 Ill. App. 3d 621, 627, 377 N.E.2d 1063.) It is the burden of the party asserting error to show how he was prejudiced by the court's decision, and absent such a showing, a court of review will not assume prejudice. *People v. Lyden* (1981), 97 Ill. App. 3d 540, 542, 423 N.E.2d 262.

    In his brief, defendant essentially recites portions of the *voir dire* examination of the discharged juror, and the court's hearing and reprimand of him. However, this does not show how he was prejudiced. Additionally, defendant points to the fact that the trial court affirmed, rather than swore in the juror. The record reveals that the court, in consideration of the fact that the juror had changed his name from a Christian to a Muslim name, had the juror affirmed. While it might have been preferable for the court to have inquired of the juror his preference for affirmation as opposed to being sworn, this does not translate into prejudice to defendant. Moreover, defendant fully participated in the *voir dire* examination of the alternates, and the alternate who replaced the excused juror was not objected to by him. We presume that the alternate who was impaneled was capable of being a fair and impartial trier of fact. (*People v. Campbell* (1984), 126 Ill. App. 3d 1028, 1040, 467 N.E.2d 1112, *cert. denied* (1985), 471 U.S. 1136, 86 L. Ed. 2d 695, 105 S. Ct. 2677.) Here, even were we to conclude that the court abused its discretion, and we do not, defendant has failed to demonstrate how he was prejudiced by the discharge of this particular juror.

    Defendant's third and final contention on appeal is that the trial court considered improper factors in rejecting probation and imposing a sentence of 12½ years. Thus, defendant maintains, the sentence must be reduced or, in the alternative, the case should be remanded for resentencing. Initially we note that the trial court is in the best position to fashion and to impose an appropriate sentence, and this court will afford its determination great deference. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344.) While reviewing courts are vested with the power to reduce sentences imposed by

the trial court (107 Ill. 2d R. 615(b)(4)), it is well settled that absent an abuse of discretion, the sentence imposed by the trial court will stand. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Younger* (1986), 112 Ill. 2d 422, 494 N.E.2d 145.) Voluntary manslaughter is a Class 1 felony which is punishable by a determinate sentence of not less than 4 and not more than 15 years' imprisonment. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—2(c), 1005—8—1(a)(4).) Thus, defendant's sentence was within the statutory parameters.

██ ██ Defendant first argues that in light of the conflicting evidence surrounding the stabbing, defendant's background, and facts known about the victim's size and recent battery conviction, the court should have seriously considered probation as a sentencing alternative. There is no absolute right to probation. The trial court has discretion to either grant or deny probation and, absent an abuse of that discretion, its refusal will not be disturbed. (*People v. Ruskey* (1986), 149 Ill. App. 3d 482, 494, 501 N.E.2d 146.) At the sentencing hearing, in aggravation, the State presented the presentence investigation, which indicated that defendant had a juvenile criminal record for theft, robbery, and battery, and asked the court to consider the facts which led up to the stabbing. In mitigation, defendant's attorney stated that defendant thought he had to protect himself and asked the court to notice that only one stab wound had been inflicted. Further, defense counsel pointed out to the court that defendant's juvenile offenses had occurred in 1981 and that he had no adult convictions. With the exception of a request to visit with his mother, defendant made no comment. Prior to pronouncing sentence, the court stated that the application for probation would not be seriously considered; "it was so unfitting the crime." It appears from the record that the trial court believed that probation would "deprecate the seriousness of the offender's conduct." The record supports the court's opinion.

██ Defendant's argument that the trial court considered an element inherent in the offense to enhance the sentence must also fail. Defendant asserts that, in deciding the sentence, the trial court considered, as a factor in aggravation, that the killing was committed without legal justification. Thus, he argues, since the absence of legal justification is an element of the offense of voluntary manslaughter, it was improper for the court to consider it as a factor. To the extent that an aggravating factor is inherent in the offense, it may not be used to enhance the sentence. (*People v. Craddock* (1987), 163 Ill. App. 3d 1039, 1048, 516 N.E.2d 1357.) A person commits voluntary manslaughter when he intentionally or knowingly kills an individual and at the time of the killing he believes that the circumstances, if

they existed, would justify the killing, but his belief is unreasonable. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(2).) The trial court here stated that it accepted the jury's verdict of manslaughter, and commented that the offense came close to murder. The court also stated that defendant had "just plain killed, without legal justification at all, the victim." In pronouncing sentence, the court stated that the record should show that based on the evidence, the presentence report, the mandatory factors set forth in the statute concerning aggravation and mitigation, and considering the victim-impact statement, the sentence would be 12½ years' imprisonment.

Defendant's reliance on *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, is misplaced. In *Saldivar*, the trial court, at the defendant's sentencing hearing, stated that the primary statutory factor in aggravation was "the terrible harm that was caused to the victim and that the victim was dead." The judge there further emphasized that the defendant's conduct had caused the victim's death. (*Saldivar*, 113 Ill. 2d at 264.) The supreme court found that the sentencing judge had improperly relied upon the aggravating factor, that the defendant's conduct caused serious harm to the victim, to impose a sentence more severe than would have been imposed if the impermissible factor had not been considered. (*Saldivar*, 113 Ill. 2d at 271.) Following the reasoning in *People v. Andrews* (1982), 105 Ill. App. 3d 1109, 435 N.E.2d 706, and in *People v. Hughes* (1982), 109 Ill. App. 3d 352, 440 N.E.2d 432, the court held that in sentencing a defendant on a conviction for voluntary manslaughter, it is permissible for the trial court, in applying the statutory aggravating factor that the defendant's conduct caused serious harm to the victim, to consider the force employed and the physical manner in which the victim's death was brought about. (*Saldivar*, 113 Ill. 2d at 271.) However, the court may not consider the end result of the defendant's conduct, *i.e.*, the death of the victim. *Saldivar*, 113 Ill. 2d at 273-74.

■ Here, the trial court expressly stated that its sentencing decision was based, among other things, on the statutory factors in aggravation and mitigation; it did not state that its decision was based on the fact that the killing was without justification. We believe that the court's comments on the gravity of defendant's conduct were permissible, and we reject defendant's representation that the comment was considered as a factor in aggravation.

■ Finally, defendant argues that the tenor of the court's comments, that defendant was "laying in wait to avenge his punch in the nose," shows that in the court's view the offense was in fact murder, and thus defendant was sentenced for murder and not voluntary man-

slaughter. Defendant's argument is not persuasive. We do not interpret the court's remarks as indicating that it believed that defendant was guilty of murder. The court expressly stated that the offense came close to being murder. The court's remarks show only that it believed defendant's conduct to be so serious as to border on the more serious offense, and nothing more. The sentence was clearly and properly based on the jury's verdict of voluntary manslaughter. We find no abuse of discretion.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

RIZZI and WHITE, JJ., concur.