THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE MARTINEZ, Defendant-Appellant.

First District (5th Division)   No. 1—87—1642

Opinion filed November 30, 1990.

Randolph N. Stone, Public Defender, of Chicago (Janet Stewart, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Sara Dil-

lery Hynes, and T. Michael Leuer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Defendant, Jose Martinez, was charged by indictment with two counts of murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2)) and one count of armed violence (Ill. Rev. Stat. 1985, ch. 38, par. 33A—2). The defendant filed two pretrial motions, a "Motion to Quash Arrest and Suppress Evidence" and a "Motion to Suppress Statements," which were denied. Following a bench trial, defendant was acquitted on the two counts of murder and the count of armed violence, but found guilty of voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) and sentenced to a term of seven years.

On appeal, defendant contends that: (1) the trial court erred by denying his motion to quash arrest and suppress evidence; (2) the trial court erred in denying his motion to suppress his inculpatory statements; and (3) the State failed to prove beyond a reasonable doubt that the defendant did not act in self-defense. The defendant's fourth contention challenging the severity of his sentence need not be addressed as it was waived by defendant at oral argument. For the following reasons, we affirm.

The matters raised by defendant's motions to quash arrest and suppress evidence and suppress statements were consolidated and resolved in a single hearing.

Defendant, Jose Martinez, testified that on August 7, 1986, at approximately 1 a.m., he was a passenger in an automobile being driven by his codefendant, Rafael Diaz. (Diaz was later acquitted by the trial judge.) The automobile, a white 1983 Buick, was owned by the defendant's stepfather, Robert Alfaro. The automobile was stopped by police in the vicinity of Springfield and Wabansia. Upon police inquiry, both individuals gave their names and addresses. The police asked both the defendant and Diaz to produce their driver's licenses, but neither man had his license in his possession. The police stop lasted approximately 10 minutes and no ticket was issued.

Defendant and Diaz lived in a second-floor apartment located at 1310 North Monticello. Defendant's mother, brother and Robert Alfaro lived on the first floor of this building. The defendant stated that there were two entrances to the second-floor apartment, the first being through the first-floor apartment and the second through the rear exterior staircase. At the top of that staircase, there was an enclosed porch with an outer screen door. Approximately four feet inside the

outer door was a second door, which led to the apartment's interior. On the night in question, the defendant testified that these doors were unlocked but closed.

When he and Diaz returned home, they immediately went to sleep but defendant was awakened by a noise that prompted him to get up out of bed. He had risen and was moving toward the interior rear door when that door opened and two men in civilian clothes entered, grabbed and handcuffed both the defendant and Diaz stating, "You're under a arrest." Defendant averred that he never identified himself or Diaz nor was he shown an arrest or a search warrant.

Thereafter, the two men took defendant and Diaz first to the location where the Buick had stalled. There they confiscated the defendant's shirt and shoes for no apparent reason, defendant having denied on cross-examination that there were bloodstains on either item. The defendant was then taken to Area 3 police station. Once there, defendant asked the arresting officers if he could call his mother in order to have her contact an attorney. The officers replied that he could make a phone call after he told them what happened.

Defendant also testified that he asked Assistant State's Attorney Michael Gerber, who arrived at the police station that morning, if he could make a phone call. According to the defendant, Gerber similarly responded that defendant could make a phone call after he spoke with him. Defendant testified that he then gave and signed a court-reported statement.

On cross-examination, defendant admitted that he was read his *Miranda* rights when he arrived at the police station and that he acknowledged to the officers that he understood them.

Edward Carfora, an officer with 10½ years' experience on the police force, testified that on August 7, 1986, at approximately 1:30 a.m., he and his partner, Officer Richard Williams, were patrolling beat 2531 in the 25th district when they observed a "clean," white, late-model Buick LeSabre being driven by an individual who appeared young and small in stature. Carfora had patrolled this area for five years, and it was his experience that it was a high crime area where auto theft was the crime most often committed. He therefore believed that the car was stolen because of the type of vehicle, the nature of the area and because it was unusual to see someone as youthful as Diaz driving such a vehicle in that area. Carfora further testified that the driver did not appear old enough to drive any vehicle.

The officers curbed the vehicle near Wabansia and Springfield. They, thereupon, asked to see the driver's license of either the defendant or Diaz, but neither man had it in his possession. The defendant

told the officers that the automobile belonged to his stepfather, Robert Alfaro. Prior to stopping the vehicle, the officers initiated a license plate number check on the mobile computer in his squad car, but it was not completed until sometime during the questioning of the two men. The license check confirmed that the car was registered to a Robert Alfaro of 1310 North Monticello. The officers ran a name check on both the defendant and Diaz, which came back clear. However, because neither man had a driver's license, the officers, without ticketing them, ordered them to park the vehicle and return with a license or a licensed driver. On cross-examination, Carfora stated that neither he nor his partner observed the driver of the Buick commit any traffic violations and that Diaz, the driver of the auto, appeared to be "in broad daylight" 17, 18, or 19 years old and five feet five or six inches tall.

Detective John Herman testified that on August 7, 1986, at approximately 1:30 a.m., he and his partner, Detective Nick Crescenzo, went to the alley behind 4430 South Lamont to investigate a homicide. There they observed a corpse lying facedown on the apron of a garage. No identification was found upon it, but, nearby, the officers found a medallion engraved with "Robert." At the scene, the detectives found a black-handled, boning-type knife and tire iron both covered with what appeared to be blood.

At the scene of the homicide, Detective Herman spoke to three witnesses who recalled seeing a white Buick with license plate number BUU 632 leave and then twice return to the alley. These witnesses also recalled seeing two Hispanic males in the alley who were driving the white Buick, but they could not identify either man in any greater detail. A computer check revealed that the Buick was registered to Robert Alfaro of 1310 North Monticello.

Detective Herman and his partner proceeded to the area of Springfield and Wabansia, where they spoke to beat officers Carfora and Williams. The beat officers advised Detective Herman that earlier that morning they stopped a white Buick with license plate number BUU 632 at 3848 West Wabansia and spoke to its occupants, two males, who identified themselves as Jose Martinez and Rafael Diaz, both of 1310 North Monticello.

Detective Herman testified that thereafter he and his partner went to 1310 North Monticello to "identify the victim and notify the family." After knocking on the first-floor front and rear doors and receiving no response, the detectives ascended the rear exterior stairway leading to the second-floor apartment and knocked on the closed, outer screen door. The apartment's inner door opened, and from be-

hind it, a man appeared. After Herman identified himself as a police officer, the man motioned for the officers to enter and then identified himself as "Jose Martinez." He was placed under arrest. The defendant identified the individual sleeping on the couch as "Rafael Diaz" at which time he was also arrested. Herman also stated he read both individuals their *Miranda* rights and then took them first to the Buick at 3848 West Wabansia where it had been stopped and then to the Area 3 police station. While at the site of the Buick, Herman confiscated from the defendant his shirt and shoes because, according to Herman, they were splattered with what appeared to be blood.

Detective Crescenzo testified that on August 7, 1986, at approximately 4:30 a.m., he had a 10- to 15-minute conversation with the defendant. Crescenzo stated that, prior to this conversation, he advised the defendant of his *Miranda* rights, and that defendant never refused to talk with him nor did defendant request a lawyer or ask to use the phone.

Assistant State's Attorney Michael Gerber testified that he had a 15-minute conversation with the defendant at approximately 9:15 a.m. on August 7, 1986, and that prior to the conversation Gerber advised defendant of his *Miranda* rights. At approximately 10:45 a.m., defendant repeated his statement to a court reporter and later signed it after it had been transcribed. Gerber added that at none of these times did defendant ask to make a phone call or ask to speak to an attorney.

At the conclusion of the preliminary hearing, the trial court denied the defendant's motion to quash arrest and suppress evidence, finding that Officers Carfora and Williams effectuated a reasonable car stop and that Detectives Herman and Crescenzo had valid authority to enter defendant's apartment and arrest him. Defendant's motion to suppress statements was also denied.

### TRIAL

Gerald Flowers, the State's first witness, testified that on August 7, 1986, at approximately 12:30 a.m., he was in the vicinity of the 4500 block of Lamont. He followed the direction of a noise which he had heard to the alley behind Lamont Street, where he saw a parked off-white Buick. He also saw an arm swing back and throw an object. Flowers testified that he subsequently saw someone enter the Buick and watched the Buick, containing two individuals, drive away and then return to the alley. Aside from identifying one of the individuals as a "white Hispanic male," Flowers could not describe either individual's face or make any further identifications.

A stipulation was entered that on August 7, 1986, at approximately 12:30 a.m., Anthony Nash observed two white Hispanic males in a light-colored 1983 Buick leaving the alley near Lamont Avenue and then return to the scene. Nash observed the automobile's license plate, BUU 632, which he disclosed to Detectives Herman and Crescenzo.

The parties also stipulated that the testimony of Detectives Herman and Crescenzo, Officer Carfora, and Assistant State's Attorney Gerber would be the same at trial as it was at the pretrial hearing.

The defendant testified on his own behalf stating that when Alfaro was drunk, he verbally abused the defendant. The defendant recalled one incident of physical abuse when Alfaro pulled his hair and another involving the defendant's brother, Anthony, when Alfaro with knife in hand chased Anthony upstairs at home during an argument.

On August 6, 1986, during the early afternoon, the defendant told Diaz that his mother, Maria Florez, was very upset because she had an argument with Alfaro over money. As corroborated by his mother's testimony, she wanted to move away from Alfaro and, if she did, defendant was going to go with her. He also expressed how displeased he was about the situation at home.

Later that evening, at approximately 10:15, at defendant's suggestion, he, Alfaro, and Diaz went out drinking. While at a bar and already intoxicated, Alfaro got into an argument with two other patrons that prompted defendant to intervene and apologize for Alfaro's behavior. As a result, Alfaro pushed defendant and told him to mind his own business or "next time they might get into it."

The three men left the bar sometime after midnight. Alfaro wanted Diaz to drive his car. Defendant testified that he and Diaz were a "little drunk," but Alfaro was "plastered." During the ride home, Diaz pulled Alfaro's car into an alley. He and Diaz exited the car to urinate, and after the defendant approached the car, Alfaro shoved him in the chest. Alfaro did not hold a weapon, but he had a "very mad look on his face" and was coming at him with his hands in a boxing position. Alfaro swung at the defendant, but missed. The defendant then ran to the car and grabbed a knife. The defendant stated that he was afraid Alfaro would stab him if Alfaro would get the knife. At that point, defendant "plunged [sic]" at Alfaro with the knife, but could not recall how many times he struck Alfaro, stating that he "started stabbing crazy." Alfaro was grabbing for the defendant's neck, face and hair. When the knife slipped out of defendant's hands, defendant pushed Alfaro back and returned to the car to get a

tire iron that he had noticed earlier. Again Alfaro moved toward the defendant with open arms like he was going to grab him, so defendant swung at Alfaro with the tire iron, stating that he "just kept swinging wildly." Alfaro fell to the ground and defendant threw the tire iron. On cross-examination, defendant admitted that at the time of the fight he was "very angry" at Alfaro and felt that he was getting back at Alfaro.

He and Diaz got back into the car and drove away, but returned to the alley to retrieve from Alfaro's body the money that Alfaro had taken from the defendant's mother that morning and Alfaro's identification so the police "would not bother [the defendant's] mother." The two returned to the scene a third time to see if Alfaro were still alive, but sped off as people were congregating at the scene.

Anthony Florez, the defendant's brother, testified that he had lived with Robert Alfaro and his mother, Maria Florez, on the first floor at 1310 North Monticello. He stated that Alfaro had a severe drinking problem which caused him to act violently towards others. Anthony stated that Alfaro was a strong man and always carried a large folding knife. He also corroborated the defendant's testimony about the incident where Alfaro, with knife in hand, chased him upstairs at home.

Maria Florez reiterated that Alfaro was violent when he was drunk and also testified that the defendant attempted to maintain a peaceful relationship with Alfaro, but Alfaro was never satisfied with the defendant's efforts.

Rafael Diaz testified that when he was walking back toward the car after leaving to urinate, he saw defendant swing the tire iron at Alfaro and hit him twice, but admitted that he did not see how the altercation began.

Dr. Robert Kirshner, a forensic pathologist, testified that he performed a post-mortem examination of the body of Robert Alfaro which revealed that the victim sustained several different knife-inflicted wounds and a blunt trauma to the head. He stated that no one wound would cause instantaneous death and that with these particular wounds, a person might still be conscious and active for a few minutes. He also stated that the victim had a blood-alcohol level of 270 milligrams per liter of blood, which is 2.7 times the legal level of intoxication in Illinois.

The trial court found defendant guilty of voluntary manslaughter and sentenced him to seven years in the Illinois Department of Corrections.

OPINION

Defendant first contends that the facts articulated by Officer Carfora to justify stopping the defendant's automobile did not give rise to a reasonable inference of criminal activity as required by *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. The defendant therefore argues that the trial court erred in denying his motion to quash arrest and suppress evidence as his arrest and his ensuing inculpatory statements are both fruits of an illegal auto stop. *Terry*, 392 U.S. at 15, 20 L. Ed. 2d at 902, 88 S. Ct. at 1876.

■■ It is well established that a police officer may stop and temporarily detain an individual for the purpose of conducting a limited investigation if the officer is able to point to specific and articulable facts which, when taken together with reasonable inferences drawn therefrom, would reasonably justify the investigative intrusion. (*Terry v. Ohio* (1968), 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880.) The court in *Terry* held that an objective standard is to be used in determining whether a stop is reasonable, namely, would the facts available to the officer at the moment of the stop warrant "a man of reasonable caution" to believe that the stop was appropriate. (*Terry*, 392 U.S. at 21-22, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880; *People v. Watson* (1986), 145 Ill. App. 3d 492, 496, 495 N.E.2d 1153, 1156.) Although a mere hunch is insufficient (*People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537), a police officer's stop may be proper under circumstances which would be insufficient to establish probable cause for an arrest warrant. *People v. Rose* (1979), 75 Ill. App. 3d 45, 393 N.E.2d 698.

Illinois has codified the holding of *Terry v. Ohio* with section 107—14 of the Illinois Code of Criminal Procedure of 1963 to provide that a police officer, after having identified himself as such, may lawfully stop any person in a public place for a reasonable period of time when he reasonably infers from all the circumstances that the individual is committing, about to commit or has committed an offense and may demand the name and address of the person and an explanation of his actions. Ill. Rev. Stat. 1989, ch. 38, par. 107—14.

■ We agree with the trial court that the State met its burden of proof on this question. Carfora testified that he had more than 10 years of experience as a police officer. For five years he had patrolled the 25th district, a high crime area, where automobile theft was the most common crime. On August 7, 1986, at 1:30 a.m., while patrolling his beat, Carfora and his partner observed the defendant and Diaz riding in a white, "clean," late-model Buick that in his estimation was of the type known to be preferred by automobile thieves and the

driver, Diaz, appeared to be very young. Based on these facts and circumstances, Carfora could have reasonably inferred that the defendant and Diaz recently had stolen the auto in which they they were driving.

The circumstances presented by this case are similar to those present in *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537. There the police officers stopped the defendant and his companion after observing that the men were both dressed in black clothing and were walking at 1 a.m. in an area where pedestrian traffic would have been very limited. The officers also knew this area had been recently plagued by burglaries. The supreme court, albeit noting that these facts presented a close case, affirmed the denial of the motion to suppress, holding that the officers' inference of an imminent or recent burglary was reasonable and that stopping the defendant therefore was reasonable under the circumstances.

Here, too, based on his five years' experience patrolling the area, Carfora could well have known that auto theft was the most common crime in his district and the car being driven by the two youthful-looking males was of the type susceptible to auto theft. These facts coupled with the time of the night, 1:30 a.m., led to the reasonable conclusion that the situation confronting Carfora was "so far removed from the ordinary that any competent police officer would be expected to act quickly to maintain the status quo rather than to observe the situation further." (*McGowan*, 69 Ill. 2d at 78, 370 N.E.2d at 540.) Therefore, the officers' action in stopping the vehicle was justified when it was reasonable for them to infer from the surrounding circumstances the likelihood that the defendant and Diaz recently had stolen the vehicle in which they were riding.

The cases relied upon by the defendant are distinguishable. In *Brown v. Texas* (1979), 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637, the officers stopped and frisked the defendant, but later testified at trial that they did not suspect the defendant of any specific misconduct. Here, however, the police officer had reason to infer that the defendant and Diaz had committed an auto theft and could cite objective facts to support that inference.

In *People v. Vanderver* (1987), 158 Ill. App. 3d 178, 510 N.E.2d 1293, the defendant was observed at 2:30 a.m. driving his car in an apartment complex parking lot that had been the scene of recent auto thefts. Because his was the lone car in motion and was seen changing directions in the parking lot, the police ran a routine license check, but that came back clear. The police thereupon stopped the defendant's vehicle and seized evidence found therein. The reviewing court

affirmed the trial court's finding that these were not facts which would give rise to a reasonably articulable suspicion of criminal activity. The instant case, however, involves a police officer's inference that an offense already had occurred. Therefore, Officer Carfora went beyond observing defendant and Diaz in an area that had been the scene of many car thefts. He also identified the vehicle as the type known to be susceptible to auto theft and that because of the driver's youthful appearance, it was unlikely that the two occupants owned the vehicle they were driving. Further, because the computer check of the license plate was not completed until sometime during the stop, Officer Carfora's concern that the car had been stolen had not yet been dispelled.

● 3 Since we hold that the police effectuated a lawful auto stop of the Buick, the defendant's contention that the information, specifically his name and address, obtained during that stop should have been suppressed as a fruit of an illegal auto stop is without merit. Accordingly, because a trial court's ruling on a motion to suppress evidence shall not be reversed unless manifestly erroneous (*People v. Starks* (1989), 190 Ill. App. 3d 503, 546 N.E.2d 71), we affirm the trial court's finding on this issue.

● 4 In the alternative, the defendant contends that even with the knowledge of his name and address, the detectives still did not have a sufficient basis to constitute probable cause for his arrest. Probable cause to justify an arrest exists when the totality of facts and circumstances within the officer's knowledge would lead a man of reasonable caution to believe that an offense has been committed and that the person apprehended has committed the offense. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) While mere suspicion by an officer that the suspect is committing or has committed a crime is insufficient to establish probable cause, proof beyond a reasonable doubt required to obtain a conviction is not necessary. *People v. Foster* (1987), 119 Ill. 2d 69, 518 N.E.2d 82.

■ In addressing the issue of probable cause, the reviewing court "should focus on probabilities and should not be unduly technical in deciding whether probable cause existed." (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 399, 495 N.E.2d 984, 989.) On review, a trial court's finding of probable cause will not be disturbed unless it is contrary to the manifest weight of the evidence. (*People v. Williams* (1985), 137 Ill. App. 3d 736, 484 N.E.2d 1191.) In light of these directives and the record below, we find that the trial court's finding that the detectives had probable cause to arrest defendant as involved in the death of Robert Alfaro was not against the manifest weight of the evidence.

Before arriving at 1310 North Monticello, the detectives had found a corpse in the alley behind 4430 South Lamont. Lying nearby was a gold chain with an attached pendant inscribed with the name "Robert." They had already spoken to witnesses who recalled seeing two Hispanic males driving a white Buick with license plate number BUU 632 leave and twice return to the scene of the homicide. By checking the plate number, they knew that this car was registered to Robert Alfaro of 1310 North Monticello. One witness, Gerald Flowers, also told the detectives that he saw a "white Hispanic male" throw a dark object and then enter the Buick. The detectives also knew that the beat officers had stopped a white Buick with license plate number BUU 632 and its occupants, two male Hispanics, identified themselves as Jose Martinez and Rafael Diaz, both of 1310 North Monticello. Thereafter, the detectives, having proceeded to 1310 North Monticello, encountered an Hispanic male who identified himself as "Jose Martinez." The defendant then identified the man asleep on the couch as "Rafael Diaz."

This case is substantially similar to *People v. Hamilton* (1981), 100 Ill. App. 3d 942, 427 N.E.2d 388. There the victim had supplied a description of her attackers and the license plate number of the car driven by the assailants to the investigating officers. An investigation of the license plate number led the police to the address of the car's registered owner, the wife of one of the defendants. At that address, two men fitting the description given by the victim were found and arrested by the police. Based on this information, which is comparable to the information known by the detectives in the instant case, the *Hamilton* court held that the arresting officers had sufficient information establishing probable cause to arrest the defendants.

Defendant next argues that even if the police had probable cause to arrest, they violated the mandate of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, which held that the fourth amendment prohibits the police from effecting a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. However, voluntary consent to enter one's home will justify a warrantless arrest at home (*People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677), and the voluntariness of such consent is a question of fact to be determined from a consideration of the totality of the circumstances. *People v. DeMorrow* (1974), 59 Ill. 2d 352, 320 N.E.2d 1.

Although the testimony as to whether there was consent to enter was conflicting, the trial court found that Detective Herman's testimony that the defendant had motioned for the officers to enter

was more credible than the testimony of the defendant. As a reviewing court, we shall not disturb the trial court's assessment of any credibility issues in the absence of manifest error because it is within the province of the trial judge, as trier of fact, to resolve credibility issues and disputed issues of fact. (*People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677.) We, therefore, hold that the trial court's finding that the police had valid authority to enter his residence and arrest him was not manifestly erroneous.

■ Accordingly, since we have found no reason to overturn the trial court's findings that the police effectuated a legal auto stop, that probable cause justifying the defendant's arrest existed and that the police had defendant's consent to enter his home and thereby arrest him, the defendant's exculpatory statements were not a contaminated fruit of any illegal arrest.

■ In the alternative, the defendant urges that the trial court erred by denying his motion to suppress statements because his confession was a product of police coercion and therefore involuntarily given. The trial court after considering the totality of the circumstances need be convinced only by a preponderance of the evidence that the statement in question was given voluntarily (*People v. King* (1986), 109 Ill. 2d 514, 488 N.E.2d 949), and that determination shall not be reversed on appeal unless it is against the manifest weight of the evidence. *People v. Davis* (1983), 97 Ill. 2d 1, 452 N.E.2d 525.

■ As proof of police coercion, the defendant contends that the police denied him the right to make a phone call or to contact an attorney. The record reflects, however, that Detectives Herman and Crescenzo and Assistant State's Attorney Gerber each testified that defendant never asked to make a phone call or to contact an attorney at any time, which the trial court found to be more credible than the defendant's testimony.

Accordingly, we find no manifest error in the trial court's assessment of the credibility issue and therefore shall not disturb the trial court's finding that the defendant's statement was voluntary given.

■ ■ Defendant's final contention is that the State failed to prove beyond a reasonable doubt that the defendant did not act in self-defense. Section 7—1 of the Illinois Criminal Code of 1961 is intended to codify the existing Illinois principles of defense of person. That section provides:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified

in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." (Ill. Rev. Stat. 1989, ch. 38, par. 7—1.)

(See *People v. Alcazar* (1988), 173 Ill. App. 3d 344, 527 N.E.2d 325.) When in the judgment of the trier of fact any of the evidence adduced at trial negates the existence of any element of self-defense beyond a reasonable doubt, the State has carried its burden. (*People v. Seiber* (1979), 76 Ill. App. 3d 9, 394 N.E.2d 1044.) The issue of self-defense presents a question of fact to be determined by the trier of fact (*People v. Balfour* (1986), 148 Ill. App. 3d 215, 498 N.E.2d 547), which will not be set aside by the reviewing court unless the evidence is so "unreasonable, improbable or unsatisfactory" that it raises a reasonable doubt of defendant's guilt. (*People v. Felella* (1989), 131 Ill. 2d 525, 533-34, 546 N.E.2d 492, 495; *People v. Polk* (1979), 70 Ill. App. 3d 903, 906, 388 N.E.2d 864, 867.) We conclude that the evidence was insufficient to raise a reasonable doubt of defendant's guilt.

Although there was evidence that the physical altercation between the defendant and Alfaro was initiated by Alfaro, defendant testified that throughout this fight, he never saw a weapon in either of Alfaro's hands. Notwithstanding this fact, defendant used a knife to inflict six stab wounds over various portions of Alfaro's body. Moreover, after stabbing him, the defendant returned to the Buick to retrieve a tire iron with which to inflict additional injuries upon Alfaro.

The defendant contends that he was justified in his use of deadly force because his belief that he was in imminent danger of deadly or great bodily harm was reasonable in light of the decedent's known propensity for violence. Although there was testimony that the decedent became violent when he drank, the record discloses that the defendant could recall only one incident where the decedent was physically abusive toward defendant and only one incident where the decedent brandished a knife during an argument. These two incidents, alone, are insufficient evidence to establish a reasonable belief that he was in danger of imminent deadly or great bodily harm, particularly under the circumstances of this case where the victim was weaponless.

Moreover, the evidence supports the trial court's conclusion that the defendant acted out of rage towards the decedent rather than in self-defense as illustrated by his own admission that he was displeased with his family situation, Alfaro's ill-treatment of his mother, and Alfaro's embarrassing behavior on the night in question. The defendant,

himself, testified that at the time of the fight, he was "very angry" and felt that he was getting back at the decedent. Therefore, based on the circumstances of this case, we find ample support for the trial court's rejection of the defense of justifiable homicide.

Accordingly for all of the reasons set forth, we affirm the judgment of the trial court.

Affirmed.

COCCIA, P.J., and MURRAY, J., concur.