THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RANDALL ROSS, Defendant-Appellant.

First District (6th Division)   No. 1—91—1783

Opinion filed March 19, 1993.

Rita A. Fry, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Janet Mahoney, and Leslie A. Quade, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Randall Ross (Ross), was indicted for the first degree murder of Stacey Bennett (Bennett). After a bench trial, he was convicted of second degree murder and sentenced to 10 years' imprisonment. The defendant first argues that the evidence, as a matter of law, did not overcome his claim of self-defense or, alternatively, that the evidence supported only a conviction for involuntary manslaughter rather than second degree murder.

Janet Jones was the girl friend of the deceased, Stacey Bennett, who was Ross' best friend. She had known Ross and Bennett for almost three years. On July 4, 1990, she was in a group which included Bennett, Ross, Shawntha Robinson (Robinson) and Orsen Johnson (Johnson), who was Ross' cousin. The group was at the "point" on the shore of Lake Michigan near the Museum of Science and Industry. They drank beer, but no one appeared to be drunk.

The car they were riding in was owned by Robinson's mother. The defendant was driving. They stopped at a gas station; Ross and Johnson pumped gas, and Bennett left the car to use the washroom. Jones testified that she heard the defendant tell Bennett that if Bennett was not back by the time Ross got through pumping gas, Ross was going to leave without him. Bennett did not return to the car before Ross was finished pumping gas, and Ross left without Bennett. They drove to their apartment at 831 East 100th Street in Chicago, and Ross and Johnson exited the car. Before Jones and Robinson drove away, Ross told Robinson, "Don't go back to the gas station and pick [Bennett] up."

Jones had seen Ross and Bennett fighting approximately four or five times in the past. There was no winner or loser in any of the fights, which Jones said were not serious and she described as just

"pushing" with "maybe a few punches taken." Neither man was ever injured in the fights. Bennett suffered from a recurring shoulder dislocation problem that caused his shoulder to "pop out of place." Ross and Bennett used a "kiss-and-make-up" procedure for ending fights; the procedure was a kiss on the forehead.

She testified that Ross and Bennett had consumed several beers. The gas station where Ross left Bennett was two or three blocks from the apartment.

Lisa Perkins was 18 years old at the time of trial. She lived a short distance away from Bennett, Ross and Johnson. She and her mother had come home early in the morning of July 5, 1990. Her mother called her into the bedroom to look out the window facing the area in front of the building where Ross and Bennett were fighting. She saw three people outside; she recognized two of the three as Ross and Bennett. She could also hear their voices. When she first saw them Bennett was on top of Ross on the ground. She heard Bennett tell Ross he was "tired of paying all the rent and the money was all coming from him *** and he was walking around with holes in his shoes while [Ross] had new shoes." She saw Bennett hit Ross once or twice with his fists. That part of the fight lasted about four or five minutes. Ross asked Bennett to stop, and Johnson told Ross and Bennett to stop fighting. Perkins saw Ross and Bennett get up from the ground and stand facing each other approximately three feet apart. Bennett had his arms down at his sides. Perkins turned away from the window for "[a]bout one or two seconds" to talk to her mother. When she turned back toward the window, Bennett was in approximately the same position he was in before she turned away. She saw Ross "pull something from like his waist area" and raise his arm to the level of his chest; then she heard a shot. Bennett grabbed his chest and fell forward. Ross stood over Bennett for a minute and then ran away.

Orsen Johnson testified that Bennett started yelling at Ross as he approached the apartment. Ross and Bennett fought for a short time; Bennett stopped for a minute and took off his shoes. Bennett got Ross down and hit him in the face. Then Ross got Bennett down and hit him in the face. Ross kissed him on the forehead to try to "make it like a joke so they could stop the fight, but that wouldn't work." Ross let Bennett up and Bennett told Ross, "When you let me up, I'm going to beat the shit out of you as soon as I get my shoulder in place." Bennett's shoulder had dislocated sometime during the fight. This had happened on other occasions. Johnson had seen Ross and Bennett fight before, but never this violently.

Johnson broke up the fight two or three times. Ross told Bennett "I quit, man" and, "You won." Johnson intervened because Ross asked him to make Bennett stop after Bennett pulled Ross' face into Bennett's knee five or six times causing Ross' face to bleed. Ross said that he only wanted to get his clothes and leave. When Johnson intervened, he saw Ross pull out a gun. Johnson pushed the gun to Ross' side and told him to leave.

Ross began walking away, but Bennett ran up, "started it all back over again," and "popped [Ross] in his face." Ross hit Bennett once or twice in the face with the gun. Johnson again tried to break up the fight, but Bennett "kept on fighting" Ross. Johnson was in between the two men when Ross "reached over and shot" Bennett. Each man had a hand on the other when the gun went off, and Ross appeared to be aiming at Bennett's shoulder.

Ross and Bennett were approximately one or two feet apart when the shot was fired; Johnson jumped out of the way when the slightly shorter Ross put the gun over Johnson's shoulder. After the shot was fired, Ross "paced over" Bennett. Johnson went to a neighbor's apartment to call an ambulance; Ross was gone when Johnson returned.

Johnson denied that Ross tried to fire the gun a second time. He admitted that he had told the police that he heard the gun hammer click a second time but that no second bullet was fired. He said that when he was questioned by the police he was still high from smoking PCP and drinking beer and had only one half-hour of sleep before he made the statement to the police.

He testified that Ross and Bennett were arguing about rent money and that Bennett was angry because Ross left him at the gas station. He thought Ross had the gun with him all evening. He admitted that he had told the police that after they left the gas station, Ross entered the apartment and "went upstairs and got his gun." Johnson believed that Ross usually carried a gun. When Ross reached over Johnson with the gun, Ross said, "Fuck it," while pulling the trigger.

Chicago police officer Conway was called to the scene of the shooting on July 5, 1990. He determined that Bennett was dead and noted that Bennett had small cuts under his left eye and on his left lip.

It was established by stipulation that Bennett died from a gunshot wound to the chest. The alcohol level in Bennett's blood was .146.

Thomas Hickey, an investigator from the public defender's office, was assigned to holiday court on July 7, 1990, and took a picture of

Ross in court that day. He noticed that Ross had a cut under his left eye, two puffy eyes, a swollen nose and a swollen left jaw.

At the time of trial, Shawntha Robinson had known Ross for approximately two years and was the mother of his child. She was eight months pregnant when the group went to the "point" on July 4, 1990. They were all traveling in her mother's car.

Once they reached the gas station, Bennett initially remained in the car to ask Jones if she would spend the night at his apartment. Jones told Bennett she wanted to go home and did not want to spend the night at his apartment. Bennett then left the car to use the washroom. Robinson told Ross that she wanted to go home to use her own washroom.

The defendant, who was 23 years old at the time of trial, testified that he had been friends with Bennett for eight or nine years. Bennett was his best friend; their families knew each other. During the course of their friendship Ross and Bennett had physical fights but had never hurt each other.

Ross, Bennett and Johnson rented their townhouse from Bennett's mother. All three paid rent but each roommate occasionally paid more than his share when another roommate was unable to pay.

The group arrived at the lake between 7:30 and 8 p.m. and began drinking. Ross had a .22-caliber gun in his underwear. He and Bennett owned the gun. Bennett previously had the gun and at one time gave it to Jones to keep at her house "because we got into some trouble in March and we got a lecture about guns." On July 4 Ross was taking the gun to Robinson's house because he "didn't want it in the house."

He told Bennett he would leave him at the gas station if Bennett was not ready to go when Ross was done pumping the gas; he told Bennett he had to leave because Robinson needed to go home. Bennett did not seem upset by this and just told Ross to leave without him. Ross saw Bennett enter the restroom before he drove away. Bennett, Johnson and Ross had planned to go out together once the women went home.

Ross did not remember going into the apartment. Johnson alerted Ross that Bennett was walking towards them, and Johnson then closed the apartment door. Bennett asked him why they had left him at the gas station. Ross told him that he left him because Robinson needed to use the washroom and because Bennett told him to leave.

Bennett grabbed Ross in a "full-nelson," but Ross "didn't think anything of it at first, [Bennett] could have been playing." Both men fell to the ground. Ross was on top of Bennett holding Bennett's

arms. Bennett yelled that he was tired of Ross and threatened to "kick [Ross'] ass." Ross then kissed Bennett on the forehead and tickled him. That procedure usually calmed Bennett enough that he would stop fighting and explain what upset him. Instead of stopping, however, Bennett told Ross "[t]hat shit's not going to work this time." He kneed Ross in the face. When Ross got up he realized his lip was ripped, he was bleeding from his nose and mouth and his chin hurt. Ross told Bennett that he had injured Ross' face; Ross bent over to wipe blood from his face with his shirt. Bennett hit him again. Johnson was trying to hold Bennett away from Ross, but Bennett kept trying to break loose, and "ran up on [Ross] again and was hitting [Ross]." Ross felt "dazed" or dizzy. Johnson broke the two men apart several times during the argument. At one point Johnson had control of Bennett, but Bennett was trying to come around Johnson toward Ross. Ross told Johnson to just give him his "stuff" and he would leave. Each time Johnson held Bennett, Bennett tried to break free and chase Ross.

Ross did start to leave and saw Bennett trying "to rip away" from Johnson by grabbing and pulling Johnson to the side. Ross was backing up from Bennett and was about five feet away from him. As he was backing away, Ross pulled the gun from his underwear and held it in his right hand. He pulled out the gun to scare Bennett because he had never seen Bennett "coming like that" before and because Bennett never kneed him in the face or made him bleed before. After he pulled out the gun, Ross again asked Johnson to give him his belongings so he could leave.

He heard Bennett say "something to the effect that he would kick [Ross'] ass" or get him before he left. Bennett then "ran up on" Ross, grabbed him with one arm, and swung at him with the other arm. The gun was still in Ross' right hand. Johnson got between them. When Johnson got between them they were all locked onto each other. Ross was falling backward because he was backing up. He went to grab onto something, and the gun went off. Ross panicked and walked to a neighbor's house. The walk took between 2 and 2½ hours because he could not see well out of one eye, had a headache, felt pain in his leg and either passed out or fell asleep on the way. He dropped the gun and his shirt while walking. He subsequently went to the police station and turned himself in at approximately 5:30 or 6 a.m.

On cross-examination, he admitted that he was about to be kicked out of the apartment by Bennett on July 4, 1990. He planned to move in with Robinson and was not upset that Bennett was asking him to

move. He admitted that he did not leave the gun at Robinson's house when he was there earlier on July 4. He knew about Bennett's shoulder injury, and he knew the shoulder became dislocated during their fight. When asked about his statement to the police that he tried to shoot Bennett in the arm, Ross stated that the gun went off accidentally, that he was not trying to shoot Bennett in the arm, and that what he told the police "may have been how it came out, but that's not what happened."

The State in rebuttal established by stipulation that Johnson told Detective Williams that after Bennett was shot and had fallen to the ground, Ross again pointed the gun at him and pulled the trigger. It was also established by stipulation that Detective Kluenen interviewed Johnson and that Johnson said that Ross went into the apartment, retrieved the gun upstairs and shot at Bennett twice though only one bullet left the gun.

■ The defendant first maintains that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. The State contends that the defendant waived any self-defense claim and that the defendant's only defense was that the killing was an accident. We disagree with the State that the issue of self-defense was not raised in the trial court. The State's position seems to be that one cannot claim both accident and self-defense. That is not the law. (See *People v. Everette* (1990), 141 Ill. 2d 147, 565 N.E.2d 1295.) The defendant's answer to the State's discovery motion asserted that the "defendant may also assert self-defense." The State, in closing argument, said that the defendant's conduct was not reckless, accidental or *justified*. The defendant's attorney argued that the defendant was acting "reasonably" under the circumstances and that he was "justified in pulling the gun because [Bennett] had been attacking him time and time again." Finally, and most important, the trial judge explained that if this had been a jury trial, he would have given a self-defense instruction. It is clear, therefore, that the issue of self-defense was raised by the defendant in the trial court and was considered by the judge.

Self-defense is an affirmative defense requiring the State to disprove the defense beyond a reasonable doubt once the defendant raises it. (Ill. Rev. Stat. 1989, ch. 38, par. 3—2; *People v. Daniel* (1989), 191 Ill. App. 3d 837, 548 N.E.2d 354.) When a fact finder rules against the defendant's self-defense claim, a reviewing court should not set aside a conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt concerning the defendant's guilt." (*People v. McGrath* (1989), 193 Ill. App. 3d 12, 28,

549 N.E.2d 843, 853.) The existence of proper self-defense is a question of fact and the State has carried its burden of proof when the trier determines that "any of the evidence adduced at trial negates the existence of any element of self-defense beyond a reasonable doubt." *People v. Martinez* (1990), 206 Ill. App. 3d 813, 827, 564 N.E.2d 1271, 1279.

A person is justified in the use of force likely to cause death or great bodily harm only if a person reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself. (Ill. Rev. Stat. 1989, ch. 38, par. 7—1.) The trial judge, the finder of fact, found that Ross believed that it was necessary to shoot Bennett but that Ross' belief was unreasonable. The test on review is not what the judges of the reviewing court would have found; the test is whether any rational trier of fact could have found that Ross' belief was unreasonable. See *People v. Sanchez* (1986), 115 Ill. 2d 238, 503 N.E.2d 277.

Bennett and Ross were almost the same size. Ross was the only one armed. He had already struck Bennett in the face with the gun. Bennett's shoulder was dislocated. Johnson was standing between Ross and Bennett. Importantly, Ross reached around Johnson to fire the shot. His statement, "Fuck it," as he reached around Johnson and fired the shot may be interpreted as an abandonment of any intention to resolve the dispute peacefully. We conclude that the evidence supports the finding of the trial judge.

■ The defendant argues alternatively that the evidence, as a matter of law, establishes that the shooting was accidental and supports a finding of involuntary manslaughter rather than second degree murder. Again we disagree with the defendant's contention. There is more than ample evidence to support the judge's finding. In addition to the evidence we have already discussed on the question of the sufficiency of the proof to support a finding of second degree murder, there is Ross' statement to the police that he intended to shoot Bennett in the shoulder.

It would serve no purpose to discuss the many cases cited by the defendant and the State in support of their arguments on the question of whether the evidence supports a finding of second degree murder and whether the evidence supports a finding that the shooting was not accidental. Suffice it to say that each case must rest on its own facts. None of the cases cited by the defendant is factually controlling.

After the indictment was returned, the case was assigned to Judge John W. Crilly. The State moved for a substitution of judge

from Judge Crilly pursuant to section 114—5(c) of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 114—5(c)). The motion was heard by Judge Robert P. Bastone, who granted the motion over the defendant's objection. Judge Bastone then allowed the defendant's oral motion for substitution from two other judges, and the case was assigned to Judge Thomas P. Durkin, who heard the case. The defendant now contends that Judge Bastone erred in granting the State's motion.

In 1987 the legislature amended section 114—5(c) of the Code to permit the State to move for a substitution of one judge on the ground that the judge is prejudiced against the State. In *People v. Williams* (1988), 124 Ill. 2d 300, 529 N.E.2d 558, the supreme court upheld the constitutionality of amended section 114—5(c). *Williams* involved a single motion by the State's Attorney against a single judge. The court explained that the substitution of judge provisions should be liberally construed, though "abuse of these statutory rights should not go unremedied." (*Williams*, 124 Ill. 2d at 309.) The court explained that defendants cannot use the procedure to delay trial, and added that "the courts or the legislature will deal with [abuses by the State] when and as they arise." *Williams*, 124 Ill. 2d at 309.

The statute was next considered in *People ex rel. Baricevic v. Wharton* (1990), 136 Ill. 2d 423, 556 N.E.2d 253. In that case, the State's Attorney made motions to substitute against Judge Milton S. Wharton in six different cases. Judge Wharton denied the motions, citing the separation of powers doctrine; he held that he could make a "limited inquiry" into the circumstances of the motions when they were filed on a "blanket basis." (*Wharton*, 136 Ill. 2d at 429.) Judge Wharton also noted that before filing the six motions, the State's Attorney had asked the chief judge to reassign Judge Wharton. Judge Wharton knew about the State's Attorney's attempts because he received two memos from the chief judge explaining that the State's Attorney "informally" requested reassignment of Judge Wharton before filing the motions and that the chief judge was reassigning Judge Wharton due to the State's Attorney's repeated motions for substitution.

The supreme court decided the case under its supervisory power. The court explained that the State's right to substitute a judge, created in 1987, "is similar to the more well-established right enjoyed by defendants" and thus could be analogized to the defendants' right. (*Wharton*, 136 Ill. 2d at 430, citing *Williams*, 124 Ill. 2d at 305.) The *Wharton* court affirmed the *Williams* holding that the statute is constitutional, but distinguished *Williams*, and held that if the six mo-

tions in *Wharton* were used to coerce the chief judge in the exercise of his assignment powers, the State's motions violated the separation of powers doctrine. Despite the fact that it found a possible constitutional violation, the court stressed "the general rule that judges cannot inquire into the truth of allegations of prejudice in [substitution of judge] motions." *Wharton*, 136 Ill. 2d at 430-31.

The supreme court established a procedure for reviewing claims that motions for substitution by the State were being used to thwart the chief judge's authority:

"First, the trial judge must determine whether there is *prima facie* evidence that the motions are being used in an effort to thwart the chief judge['s] *** independence in assigning cases *** ***.

If the trial judge determines that a *prima facie* case does not exist, the section 114—5(c) motion must be granted. If a *prima facie* case is found to exist, a hearing shall be conducted ***." *Wharton*, 136 Ill. 2d at 438-39.

The court listed several factors that a judge may consider in making the *prima facie* determination, such as previous conduct by the State's Attorney toward the judge in question. (*Wharton*, 136 Ill. 2d at 439.) The court held that, under this test, Judge Wharton had established in each of the six cases the required *prima facie* evidence and remanded the case for hearings.

■■ The defendant claims that Judge Bastone did not first make a finding about the presence of a *prima facie* case of abuse, and thus committed reversible error. Again we disagree with the defendant's argument. We interpret *Wharton* to mean that the burden is on the defendant to at least allege facts which, if true, would require the judge to conduct a hearing. We do not interpret *Wharton* to mean that when a motion for a substitution of judge is made by the State, the judge must *sua sponte* announce the presence or absence of a *prima facie* case of abuse. The record in this case is bereft of any allegation or proof that the State's single motion in this case was designed to thwart the chief judge's powers of assignability or to delay the case. The only "evidence" before Judge Bastone was the prosecutor's specific statement that the State's Attorney did not intend to object to Judge Crilly in every case. Consequently, we find that Judge Bastone, on the basis of the record before him, correctly found that there was no reason to circumvent the general rule for granting substitution motions.

The defendant's last claim is that the sentence of 10 years was excessive. He asks that we reduce the sentence to the minimum term of four years.

The defendant was 20 years old at the time of the killing. He had no previous convictions, no probation record and two previous arrests. The judge heard a victim-impact statement of Bennett's mother. Officer Edward Haynes testified that on March 12, 1990, he observed the defendant disobey a red light; the officer stopped him to give him a ticket. He learned that Ross did not have a driver's licence and arrested him. In the search of the car he found a fully loaded revolver under the driver's seat. He testified that Ross cooperated fully when arrested. The record does not disclose the disposition of that case.

In mitigation, Ross submitted a report prepared by the public defender sentencing advocacy team (Team) that recommended intensive probation and restitution as a sentence for Ross. It was established that he had a job at a paint store waiting for him. The Team interviewed family and friends of both Ross and Bennett to prepare its report and stressed that Ross recognized the seriousness of his crime. In conjunction with the report, the Team submitted 18 letters of support from family, friends and Illinois Department of Corrections employees who worked with Ross during his detention before and after trial. (Ross was never released on bond.) The letters generally praised Ross' character and stressed the closeness of Ross and Bennett and the ability of Ross to function well in society.

Nate Robinson, Shawntha Robinson's father, testified that he was a district sales manager for Interstate Brands and was a very good friend of the personnel manager there. He explained there was a possibility he could obtain employment for Ross.

Shawntha Robinson testified that Ross' child was eight months old and that if he was released, Ross could live with her.

Tracy Ross, the defendant's sister, also testified and identified 13 other friends and family members who were in court to show support for Ross; they included Ross' mother, who made the trip to Chicago from her home in Ohio.

The defendant apologized to both families involved, said that he was very sorry and stated that he "realize[d] how serious this is and everything but it wasn't on purpose."

The trial judge noted that he was "duty bound to consider probation as a sentence." He stated that a "factor to be considered" was the "tremendous amount of family support on both sides." He noted the "serious evidence regarding the defendant's willfully arming himself with a firearm that day" and the evidence that Ross previously

had possession of a gun. He noted that Ross had no previous convictions and stated that "[t]hese are always difficult cases because [he] genuinely believe[d] Mr. Ross when he grieves for his friend." He specifically found that imprisonment was necessary to protect the public and that probation would deprecate the seriousness of the crime.

■ We acknowledge that the defendant has made an appealing argument in mitigation. But it is the same argument that was considered in great detail by the trial judge. A reviewing court should reduce a sentence only if a trial judge abuses his discretion. (*People v. Rose* (1989), 191 Ill. App. 3d 1083, 548 N.E.2d 548.) A trial court "is the better forum for establishing and imposing an appropriate sentence, [thus] a court of review gives deference to the trial court's determination." (*People v. Ruskey* (1986), 149 Ill. App. 3d 482, 494, 501 N.E.2d 146, 154.) The test on review of sentences is not what sentence the judges of the reviewing court might have imposed; the test is whether or not the trial judge abused his discretion. We cannot say that the judge in this case did abuse his discretion.

The principal case cited by the defendant, *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, does not assist the defendant's position. In that case the supreme court reduced a sentence because the trial judge had considered an improper factor in sentencing. There is no allegation that the trial judge in this case considered an improper factor. See *People v. Rose* (1989), 191 Ill. App. 3d 1083, 548 N.E.2d 548.

For all these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.